# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

**FILED**

APR 1 6 2012

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

**UNITED STATES OF AMERICA**

v.

Michael LOTT, aka "Miami the Most"
Major NORTON, aka "Dubee"
Lawrence Kennedy NELSON, aka "Bodine"
Gaylord FRANKLIN, aka "Geezy"
Clifford BULLOCK, aka "Black"
Narco McFARLAND, Sr.
Latroy CUNNINGHAM
Eric ROBINSON, aka "Pay Pay"
Dante BARBARIN
Eileen KNIGHT
Beshiba COOK, aka "Pebbles"
Bruce THURMON, aka "Little Bruce"
Damian PETERSON
Mikel BROWN

**CRIMINAL COMPLAINT**

CASE NUMBER:

2 12 - MJ - 0 1 0 1     GGH

# SEALED

I, the undersigned complainant, state that the following is true and correct to the best of my knowledge and belief. On or about **the dates set forth below** in the **Counties of Solano, Sacramento**, and elsewhere, in the Eastern District of California, the defendants did the following:

**Count One**: **Michael LOTT, Major NORTON, Gaylord FRANKLIN, Clifford BULLOCK, Narco McFARLAND, Sr.,** and **Latroy CUNNINGHAM** - participating in a criminal conspiracy to distribute and possess with intent to distribute MDMA and marijuana, Schedule I Controlled Substances, between approximately July 1, 2008, and the present, all in violation of 21 U.S.C. §§ 846 and 841(a)(1).

**Counts Two, Three, Four, and Five**: **Michael LOTT** – distribution of a mixture and substance containing a detectable amount of MDMA, a Schedule I Controlled Substance, on or about August 6, 2008, September 10, 2008, March 25, 2010, and April 9, 2010, in violation of 21 U.S.C. § 841(a)(1).

**Count Six**: **Michael LOTT** and **Gaylord FRANKLIN** – distribution of a mixture and substance containing a detectable amount of MDMA, a Schedule I Controlled Substance, on or about April 16, 2010, in violation of 21 U.S.C. § 841(a)(1).

CONTINUED ON NEXT PAGE

**Counts Seven and Eight: Michael LOTT** and **Major NORTON** – distribution of a mixture and substance containing a detectable amount of MDMA, a Schedule I Controlled Substance, on or about July 30, 2010, and August 27, 2010, in violation of 21 U.S.C. § 841(a)(1).

**Count Nine: Michael LOTT** and **Lawrence Kennedy NELSON** - participating in a criminal conspiracy to distribute and possess with intent to distribute at least 280 grams of a mixture and substance containing a detectable amount of a form of cocaine base known as "crack cocaine," a Schedule II Controlled Substance, between approximately October 30, 2008, and the present, all in violation of 21 U.S.C. §§ 846 and 841(a)(1).

**Counts Ten, Eleven, Twelve, Thirteen, and Fourteen: Michael LOTT** and **Lawrence Kennedy NELSON** – distribution of at least 28 grams of a mixture and substance containing a form of cocaine base known as "crack cocaine," a Schedule II Controlled Substance, on or about October 22, 2008, January 28, 2009, May 28, 2008, December 8, 2009, and March 25, 2010, all in violation of 21 U.S.C. § 841(a)(1).

**Count Fifteen: Michael LOTT** and **Eric ROBINSON** - participating in a criminal conspiracy to distribute and possess with intent to distribute at least 100 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, between approximately May 28, 2009, and the present, all in violation of 21 U.S.C. §§ 846 and 841(a)(1).

**Counts Sixteen and Seventeen: Michael LOTT** and **Eric ROBINSON** – distribution of a mixture and substance containing heroin, a Schedule II Controlled Substance, on or about May 28, 2009, and August 11, 2009, all in violation of 21 U.S.C. § 841(a)(1).

**Count Eighteen: Michael LOTT, Dante BARBARIN, Eileen KNIGHT** and **Beshiba COOK** - participating in a criminal conspiracy to distribute and possess with intent to distribute Oxycondone, a Schedule II Controlled Substance, between approximately March 21, 2010, and the present, all in violation of 21 U.S.C. §§ 846 and 841(a)(1).

**Count Nineteen: Beshiba COOK** – using a communication facility to facilitate a drug trafficking crime, specifically, using the telephone assigned number (510) 776-5076 to facilitate the crime of conspiracy to distribute and possess with intent to distribute Oxycondone, during an intercepted call with Michael LOTT, on or about March 23, 2010, all in violation of 21 U.S.C. § 843(b).

**Count Twenty: Michael LOTT** and **Eileen KNIGHT** - possession with intent to distribute Oxycondone, a Schedule II Controlled Substance, on or about December 16, 2010, in violation of 21 U.S.C. § 841(a)(1).

**Counts Twenty-One and Twenty-Two: Damian PETERSON** – using a communication facility to facilitate a drug trafficking crime, specifically, using the telephone assigned number (707) 704-2398 to facilitate the crime of conspiracy to distribute and possess with intent to distribute cocaine, during intercepted calls with Michael LOTT, on or about March 22, 2010, and April 16, 2010, all in violation of 21 U.S.C. § 843(b).

**Counts Twenty-Three, Twenty-Four, and Twenty-Five: Mikel BROWN** – using a communication facility to facilitate a drug trafficking crime, specifically, using the telephone assigned number (707) 333-3209 to facilitate the crime of conspiracy to distribute and possess with intent to distribute cocaine and a form of cocaine base known as "crack cocaine," during intercepted calls with Michael LOTT, on or about March 27, 2010, March 29, 2010, and April 3, 2010, all in violation of 21 U.S.C. § 843(b).

CONTINUED ON NEXT PAGE

**Count Twenty-Six**: Bruce THURMON – using a communication facility to facilitate a drug trafficking crime, specifically, using the telephone assigned number (707) 731-2743 to facilitate the crime of conspiracy to distribute and possess with intent to distribute cocaine, during an intercepted call with Michael LOTT, on or about March 22, 2010, all in violation of 21 U.S.C. § 843(b).

I further state that I am a DEA Special Agent and that this complaint is based on the following facts:

▸    **PLEASE SEE ATTACHED AFFIDAVIT**

Continued on the attached sheet and made a part of this complaint:  **X**

Signature of Complainant   **Brian M. Nehring, DEA Special Agent**

Sworn to before me, and signed in my presence
**April 16, 2012**                                                     at    **Sacramento          California**

Date                                                                             City                        State

**GREGORY G. HOLLOWS**

**Gregory G. Hollows    United States Magistrate**

Name of Judge                    Title of Judge                    Signature of Judge

### Affidavit of DEA Special Agent Brian Nehring in Support of Criminal Complaint and Arrest Warrants

I, Brian M. Nehring, being duly sworn, depose and state the following:

### Training and Experience

1.  I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7) and I am empowered by law to conduct investigations and felony arrests. I am a Special Agent of the Drug Enforcement Administration ("DEA"), San Francisco Field Division, and have been so employed since 1991. Prior to becoming a DEA Special Agent, I graduated from the California State University, Sacramento in 1990 with a Bachelors of Science in Criminal Justice. I then completed a four-month DEA Basic Agent School at Quantico, Virginia. I have had numerous assignments since beginning with DEA, including being assigned to the Clandestine Laboratory Enforcement Team from 1997 to 1999, the Oakland Resident Office between 1999 and 2002, and the Mobile Enforcement Team between 2002 and 2004. I have been assigned to the Sacramento Division Office since September of 2004.

2.  I am presently assigned to DEA in Sacramento, California. My duties as a Special Agent involve the investigation of various criminal activities of narcotics traffickers and their associates. In investigating these matters, I have acted as a case agent, undercover agent, contact agent for confidential sources, and have participated previously in the utilization of wire and electronic surveillance. These investigations have resulted in the issuance of federal search warrants, seizure warrants, indictments, and convictions of persons for federal narcotics violations. During my narcotic assignments, I have received numerous hours of training in narcotics enforcement and investigative techniques and have personally participated in several hundred narcotics investigations. In addition, I have also spoken on numerous occasions with informants, suspects, and other experienced narcotics traffickers concerning the methods and practices of drug traffickers. I have been involved in various types of electronic surveillance, including the consensual monitoring of telephone calls. I have discussed these activities with other law enforcement agents who have knowledge of the distribution and transportation of controlled substances, the laundering and concealing of proceeds from drug trafficking, and the criminal gangs who participate in these illegal activities. I know, based upon my experience, and the experience of other agents and law enforcement officials with whom I have consulted, that drug traffickers and money launderers utilize telephones to facilitate their illegal activities. I have learned through experience and through consulting with other experienced law enforcement officers, that court authorized intercepts of wire communications provide valuable evidence of ongoing narcotics trafficking activities.

3.  As a result of my participation in this investigation, and through review and analysis of information received from various sources, including administrative subpoenas, Grand Jury Subpoenas, reports of other law enforcement agencies, law enforcement investigators, telephone toll records and pen registers, I am familiar with all aspects of this investigation. In addition to my personal knowledge, the statements contained in this Affidavit are based in

part on (1) information provided by the DEA, FBI, Vallejo Police Department, and other law enforcement officials, including oral and written investigative and laboratory reports that I have received directly or indirectly from DEA and other law enforcement officials; (2) information provided by gang specialists and narcotics specialists of the Vallejo Police Department, and other law enforcement agencies; (3) results of physical surveillance conducted by DEA, Vallejo Police Department, and other law enforcement officials, which have been reported to me either directly or indirectly; (4) information provided from confidential sources of information, cooperating defendants, and other sources of information working with DEA, Vallejo Police Department and other law enforcement agencies; (5) a review of telephone toll records, pen register, trap and trace, and subscriber information; (6) information derived from consensually monitored telephone conversations; (7) a review of drivers license and automobile registration records; (8) records from the National Law Enforcement Telecommunications System (NLETS) and the National Crime Information Center (NCIC); (9) my training and experience as a Special Agent with DEA; and, (10) the training and experience of other DEA Agents, FBI Agents, Vallejo Police Department Detectives, and other law enforcement officials with whom I consulted during this investigation and the preparation of this Affidavit.

### Scope of Requested Criminal Complaint

4.  This Affidavit is submitted in support of a request for a Criminal Complaint and arrest warrants charging members of the Michael LOTT Drug Trafficking Organization ("LOTT DTO") with violations of multiple sections of Title 21 of the United States Code. Specifically, offenses involving violations of Sections 841, 843, 846 of Title 21, United States Code, including the manufacturing, distribution, and possession with intent to distribute controlled substances, including 3,4 methylenedioxymethamphetamine ("MDMA," popularly known as the drug "ecstasy"), cocaine, cocaine base, heroin, oxycodone and marijuana.

5.  On the basis of the information contained in this Affidavit, my experience and training, and on the basis of other information that I have reviewed and determined to be reliable, I believe there is probable cause to believe that Michael LOTT, Nicholas RAMIREZ, and members of the LOTT DTO, committed the following crimes:

    a.  Possession with intent to distribute and distribution of MDMA, cocaine, cocaine base, heroin, oxycodone, and marijuana, in violation of Section 841 of Title 21, United States Code;

    b.  Conspiracy and attempt to possess with intent to distribute and to distribute MDMA, cocaine, cocaine base, heroin, oxycodone, and marijuana, in violation of Title 21, United States Code, Sections 841, 846; and

    c.  Use of communication facilities to facilitate drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b).

6.   Based upon the facts set forth below, there is probable cause to believe that the following individuals:

   a.   **Michael LOTT, aka "Miami the Most,"**
   b.   **Major NORTON, aka "Dubee,"**
   c.   **Lawrence Kennedy NELSON, aka "Bodine,"**
   d.   **Gaylord FRANKLIN, aka "Geezy,"**
   e.   **Clifford BULLOCK, aka "Black,"**
   f.   **Narco McFARLAND, Sr.,**
   g.   **Latroy CUNNINGHAM,**
   h.   **Eric ROBINSON, aka "Pay Pay,"**
   i.   **Dante BARBARIN,**
   j.   **Eileen KNIGHT,**
   k.   **Beshiba COOK, aka "Pebbles,"**
   l.   **Bruce THURMON, aka "Little Bruce,"**
   m.   **Damian PETERSON, and**
   n.   **Mikel BROWN,**

have committed the violations of the criminal statutes set forth above (collectively referred to as the "Subject Offenses"). The specific charges for each defendant are set forth at the conclusion of this Affidavit.

## Background of THIZZ ENTERTAINMENT and the LOTT DTO

"The Crest" Neighborhood of Vallejo, California

7.   The LOTT DTO relies on a network of drug distributors working in the "Crest" neighborhood of Vallejo, California, along with individuals transporting large quantities of drugs outside of California to realize a larger profit.

8.   The Vallejo neighborhood known as the Country Club Crest is often referred to simply as "The Crest." The Crest is located in the northern section of Vallejo. It is an older Vallejo neighborhood of single-family residences. For more than 20 years, the Crest has been known as an area of high-drug trafficking, extreme violence, and gang activity.

Background of THIZZ ENTERTAINMENT

9.   Between 2004 and 2006, a DEA confidential source ("CS-1") provided historical background about the origin of THIZZ ENTERTAINMENT, its relationship to the LOTT DTO, and many of the Target Subjects in this investigation. Much of the information about THIZZ ENTERTAINMENT is corroborated from my review of multiple published articles that include interviews and quotes from the individuals described below. THIZZ ENTERTAINMENT began as a predecessor record label run by rapper Andre HICKS, also known as "Mac Dre." In the early 1990's, HICKS owned a record label named "Romp Records." That name arose from HICKS's association with the notorious Vallejo-based crew known as the Romper Room Gang.

10.  Currently, gang members from Vallejo's "Crest" neighborhood enjoy a mild celebrity in the gang subculture based upon Andre HICKS. HICKS became a nationally-known rap music star known as "Mac Dre." HICKS was from the Crest and was affiliated with the Romper Room Gang. HICKS started the THIZZ ENTERTAINMENT label and LOTT is now listed as the co-CEO of THIZZ ENTERTAINMENT along with former Romper Room Gang member Simon Curtis NELSON. Many of the Target Subjects in this investigation, including Major NORTON, have released rap albums through THIZZ ENTERTAINMENT. DIGGS is also a former Romper Room Gang member.

The Romper Room Gang

11.  The first criminal street gang from the Crest to gain notoriety was known as the Romper Room Gang. The primary activities of the Romper Room Gang included armed bank robberies, drug trafficking, and murder. The Romper Room Gang was extremely active throughout the late 1980's and 1990's. However, as a result of Vallejo Police investigations with the assistance from federal law enforcement, many Romper Room gangsters were convicted of federal crimes and incarcerated for several years in the state and federal prison systems.

12.  Federal authorities began investigating HICKS and other Romper Room Gang members for a series of bank robberies that occurred throughout Northern California. Authorities were led, in part, to HICKS and his crew after HICKS began producing records that included lyrics detailing and glorifying their robberies.

Creation of THIZZ ENTERTAINMENT

13.  After serving federal prison terms for bank robbery, HICKS and Simon Curtis NELSON joined to form THIZZ ENTERTAINMENT. According to published reports, THIZZ ENTERTAINMENT started in approximately 1999 as a record label promoting and producing rap artists from the San Francisco Bay Area, primarily from the Crest neighborhood of their hometown of Vallejo, California. Target Subject Major NORTON is a rap artist produced by HICKS on the THIZZ ENTERTAINMENT label using the entertainment name "Dubee."

14.  The name "THIZZ ENTERTAINMENT" originates from HICKS coining the term "Thizz," which is slang for the drug MDMA (also known as "ecstasy"). In many of HICKS's songs and the artists of the THIZZ ENTERTAINMENT label, the lyrics glorify and promote the use and distribution of MDMA pills. During my time acting in an undercover capacity to purchase MDMA, I have frequently heard drug dealers use the term "Thizz" as slang for MDMA pills.

15.  On November 1, 2004, HICKS was murdered in Kansas City, Missouri. After HICKS's murder, I learned through various articles and database checks that Simon Curtis NELSON, also known as "Kilo Kurt," and Michael LOTT, also known as "Miami the Most," took over THIZZ ENTERTAINMENT. According to the articles quoting NELSON and LOTT, THIZZ ENTERTAINMENT continued to produce artists including Major NORTON, Jamal DIGGS (a co-defendant with NELSON and HICKS in the 1992 federal bank robbery case

involving the Romper Room Gang), as well as popular artists Charles WILLIAMS, also known as "Keak the Sneak," and Steven DAVISON, also known as "PSD."

Background of CS-1

16. Beginning in 2004 and continuing through 2006, CS-1 agreed to cooperate with DEA after being arrested on state charges relating to theft. CS-1 initially provided information to law enforcement in hopes of receiving consideration for those pending theft charges. The assigned Deputy District Attorney's Office authorized CS-1's effort to cooperate on his/her case. CS-1 subsequently received a reduction in sentence on the state theft case for the assistance he/she provided to DEA. At the time CS-1 provided information about the LOTT DTO and THIZZ ENTERTAINMENT, CS-1 was cooperating in exchange for monetary compensation.

17. CS-1's criminal history includes the following:

   a. On or about April 26, 2000, misdemeanor convictions for being under the influence of a controlled substance and possessing drug paraphernalia. On or about April 26, 2000, CS-1 was sentenced to 3 years probation for these convictions.

   b. On or about August 14, 2003, a misdemeanor conviction for possession of a controlled substance. On or about August 14, 2003, CS-1 was sentenced to 6 days jail for this offense.

   c. Between on or about June 7, 2004 and May 4, 2005, CS-1 was arrested on multiple occasions for possession of false checks, receiving stolen property, grand theft, auto theft, possession of a controlled substance and burglary. These arrests resulted in felony convictions on or about April 21, 2005, in Napa County, California, and September 22, 2005, in Solano County, California for multiple counts of possession of a forged or false checks and auto theft. On or about April 21, 2005, CS-1 was sentenced to 8 months in prison and 3 years probation in Napa County and 2 years in prison for in Solano County for felony convictions.

   d. On or about June 28, 2006, a felony conviction for violation of parole and for insufficient funds/checks. On or about August 21, 2006, CS-1 was sentenced to 16 months prison for these offenses.

   e. On or about December 8, 2008, CS-1 was arrested for assault with a deadly weapon, threats, and grand theft. This arrest resulted in a parole violation for CS-1 on or about May 28, 2009. CS-1's parole was violated and he/she was given a period of time in prison. The exact length CS-1's prison term is not clear from his/her rap sheet.

   f. On or about September 17, 2009, CS-1 was arrested for robbery, conspiracy, and burglary. CS-1 received a prison term from these crimes.

18. Information provided by CS-1 has proven reliable and was independently corroborated through telephone records, physical surveillance, public records and information provided by other confidential sources and sources of information. I have not found CS-1's information to be false or intentionally misleading.

19. During several separate investigations, CS-1 made controlled purchases of controlled substances at my direction and provided introductions for undercover agents to known drug traffickers. Those cases involving CS-1 resulted in the issuance of federal search warrants and seizures of large amounts of controlled substances, primarily methamphetamine, large amounts of U.S. currency and firearms. In addition, CS-1's information and cooperation led to the arrest, prosecution, and conviction of several separate individuals on federal drug trafficking charges. For these reasons, I consider CS-1's information in this investigation reliable.

## Information from CS-2 and Drug-Related Contact with LOTT Over TARGET TELEPHONE 1

20. In July of 2008, a second Confidential Source used in this investigation ("CS-2"), contacted LOTT over a predecessor cell phone number for LOTT using my phone. During the call with LOTT, CS-2 arranged for LOTT to deliver approximately 200 MDMA pills in Vallejo, California. During the drug deal between CS-2 and LOTT, I was present in a nearby vehicle. LOTT observed me while he sold the MDMA to CS-2 and CS-2 told LOTT that I was the buyer of those pills.

21. Following this drug deal, CS-2 was incarcerated and I called LOTT directly using my same UC phone number previously used by CS-2. During a recorded call with LOTT over a predecessor phone number, LOTT asked whether I was the individual he had observed during the earlier MDMA deal with CS-2. I told him that I was. LOTT then asked whether I was interested in still obtaining MDMA despite CS-2's incarceration.

Background of CS-2

22. In approximately 2008, CS-2 provided information to DEA in exchange for monetary compensation.

23. CS-2's criminal history includes the following:

   a. On or about May 11, 2000, misdemeanor convictions for possession of controlled substance paraphernalia and trespassing. On or about August 21, 2001, CS-2 was sentenced to diversion for these offenses and the case was dismissed.

   b. On or about October 19, 2001, misdemeanor convictions for resisting arrest and disorderly conduct/being under influence of drugs. On or about October 19, 2001, CS-2 was sentenced to 2 years of probation for these offenses.

c. On or about February 5, 2004, and June 10, 2004, CS-2 was convicted of misdemeanors for battery and violation of a court order to prevent domestic violence as well as probation violation. On or about February 5, 2004, CS-2 was sentenced to 2 years of probation and 15 days jail and on or about June 10, 2004, CS-2 was sentenced to 3 years of probation for these offenses.

d. On or about April 21, 2005, a felony conviction for receiving stolen property. On or about April 21, 2005, CS-2 was sentenced to 63 days jail and 3 years of probation for this offense.

e. On or about January 10, 2005, March 14, 2006, and April 23, 2007, CS-2 was arrested for probation violations.

f. On or about August 2, 2007, CS-2 was arrested for failure to appear on felony charges and resisting arrest. No disposition for this arrest is listed on CS-2's rap sheet.

g. On or about February 8, 2008, CS-2 was arrested for a probation violation on earlier charges and petty theft. On or about March 6, 2008, CS-2 was convicted of a misdemeanor for petty theft with a prior. On or about March 6, 2008, CS-2 was sentenced to 3 years probation for these offenses.

h. On or about November 16, 2009, CS-2 was arrested for parole violation and battery on a spouse/cohabitant. On or about December 10, 2009, the battery case was dismissed and CS-2 was committed to state prison for parole violations.

24. Information provided by CS-2 was proven reliable and was independently corroborated through telephone records, physical surveillance, public records, and information provided by other confidential sources and sources of information.

25. I have not found the CS-2's information to be false or intentionally misleading.

26. In another past investigation, CS-2 made a controlled purchase of a controlled substance at my direction. In addition, CS-2's information and assistance was utilized in obtaining a state search warrant. As a result of that state search warrant, law enforcement seized controlled substances and a firearm.

27. For these reasons, I consider CS-2's information in this investigation reliable.

## August 6, 2008 - UC Purchases 400 Pills from LOTT -Surveillance Identifies LOTT DTO Member Marico WHITEMON

28. During August of 2008, I conducted a recorded call with LOTT over a predecessor cell phone number. During the recorded call, I arranged to purchase MDMA from LOTT on August 6, 2009. On August 6, 2009, I met with LOTT at the Gateway Plaza Shopping Center on Sonoma Boulevard (Highway 29) in Vallejo. During the surveilled drug deal, I

wore a recording device to document the drug deal. Surveillance agents also videotaped and photographed the drug deal with LOTT.

29.  LOTT arrived and met me. He said he was waiting for his friend who lived across the street at the Austin Creek Apartment Complex (55 Valle Vista Avenue, Vallejo) to come home because his friend had the pills in his apartment. While we were waiting, LOTT placed several calls to this individual attempting to ascertain his location. Subsequent toll analysis revealed that LOTT called a phone subsequently determined to be utilized by Marico WHITEMON. LOTT told me to wait at the Gateway Plaza Shopping Center while he walked across the street to the apartment complex. Surveillance agents followed LOTT to the vicinity of WHITEMON's apartment. A short time later, LOTT walked back across the street and sold me 400 pills for $1600.

30.  Surveillance agents then observed LOTT walking back across the street to the apartment complex where he reentered WHITEMON's apartment. LOTT later contacted me in a recorded call and told me that if I was dissatisfied with the quality of the pills, then he would be willing to refund my money because he wished to keep my future business.

31.  Subsequent analysis by the DEA Western Regional Laboratory confirmed that the pills sold by LOTT on August 6, 2008, contained Dextromethoraphan and Caffeine. I know from my training and experience that pills containing this combination are often sold and represented as MDMA tablets, and that I have purchased pills containing this combination on prior occasions.

### September 10, 2008 - UC Purchases 2,000 MDMA and BZP Pills from LOTT - Surveillance Observes LOTT DTO Member Marico WHITEMON

32.  During recorded calls with LOTT over his predecessor cell phone number, I arranged to purchase approximately 2,000 MDMA pills from LOTT on September 10, 2008, for $6400. During these recorded calls, LOTT told me that he had traveled to Hawaii and lost his telephone and obtained a new one. To accomplish the drug deal, LOTT instructed me to meet him at the Gateway Plaza Shopping Center across the street from the Austin Creek Apartments.

33.  During the September 10, 2008 drug deal, I wore a recording device to document the purchase. Surveillance agents videotaped and photographed the drug deal. LOTT arrived and informed me that he had to go across the street to the apartments to meet with his friend who had the pills. Agents subsequently observed LOTT walk across the street to the Austin Creek Apartments where he entered WHITEMON's apartment.

34. LOTT called me several times to say that they were waiting on the pills to arrive. A short time later, officers observed a vehicle arrive at the rear of the apartment complex. LOTT and WHITEMON walked from apartment to meet with the occupants of this vehicle. Detective Rodriguez (concealed in a vehicle only a few feet away) saw LOTT and WHITEMON meet with as a Filipino female (driver) and possibly a Filipino male (passenger) with a shaved head. Officers observed WHITEMON receive a brown paper bag from the male through the car window before he and LOTT walked back into the complex and the car drove away. Within minutes, LOTT walked out the front of the complex carrying what appeared to be the same paper bag observed earlier by surveillance agents. LOTT delivered the brown bag to me across the street. Inside, I found two separate bags, each containing approximately 1,000 tablets.

35. During this drug deal, I told LOTT that I was interested in obtaining cocaine. LOTT told me that he was really a cocaine dealer, not an MDMA dealer, and that selling cocaine was what he really did. LOTT admitted that he was currently obtaining kilogram quantities of cocaine for between $20,000 and $25,000.

36. LOTT then walked back to WHITEMON's apartment. A short time later, the same vehicle previously spotted by surveillance returned to the rear of WHITEMON's apartment complex. Officers observed WHITEMON and LOTT walk from WHITEMON's apartment back to this vehicle. They apparently delivered money for the pills to the same two occupants before the vehicle left. Agents followed this vehicle to a residence in Fairfield, California, where it parked and which the individuals entered.

37. As detailed below, LOTT DTO member Marico WHITEMON was subsequently murdered in Vallejo on February 6, 2010.

38. The DEA Western Regional Laboratory subsequently analyzed the substance purchased from LOTT on September 10, 2008, and determined that approximately 1,065 of these tablets contained MDMA (369.9 grams) and the remaining pills contained Benzyl Piperizane ("BZP"). I know from my training and experience and from speaking to forensic chemists at the DEA laboratory, BZP is a Schedule I Controlled Substance that is often sold as MDMA because its narcotic effects mimic those of MDMA. Over the last several years, BZP accounts for a large quantity of the pills seized from Canadian-based drug trafficking organizations.

### October 2008 - LOTT Obtains TARGET TELEPHONE 1

39. In early October 2008, I received a recorded call from LOTT over **TARGET TELEPHONE 1**. During the recorded call, LOTT told me that **TARGET TELEPHONE 1** was his new telephone number. LOTT offered to provide me with a sample of cocaine. Ultimately, I arranged to meet with him on October 22, 2008, in Vallejo.

**October 22, 2008 - UC Obtains Cocaine Sample from LOTT - LOTT Offers Cocaine Base and Identifies LOTT DTO's Partnership with Marijuana Dispensary and Marijuana Supplier**

40.   On October 22, 2008, I met with LOTT again at the Gateway Plaza. LOTT asked me to drive him around to his vehicle, which he identified as a black Mercedes Benz with paper plates, at the back of the Austin Creek Apartments across the street. I agreed. During this surveilled and recorded meeting, LOTT provided me with a sample of cocaine.

41.   During our meeting, LOTT told me that last year (2007) he had been paying approximately $15,000 for a kilogram of cocaine, but the price had increased to $28,000 per kilogram. LOTT said he was paying $14,000 for a half kilogram of cocaine. LOTT also said he was selling "pure" ounces of cocaine for $1100 per ounce. I told LOTT that I had a buyer who wanted the cocaine in order to convert it into cocaine base. LOTT then offered to deliver the cocaine base and said he could convert the cocaine into cocaine base himself. LOTT claimed he could sell decent quality cocaine base for around $800 per ounce.

42. During our meeting, LOTT also told me that he was "partners" with an individual operating a marijuana dispensary in Vallejo. LOTT admitted that he routinely purchased or arranged for the purchase of large amounts of marijuana from growers he knew in Mendocino County and in Grass Valley (both located in Northern California). LOTT also told me that his partner would pay $4,200 per pound for high-quality marijuana. LOTT admitted that he arranged to purchase 20-pound quantities of marijuana at $3,000 per pound. LOTT claimed that this arrangement resulted in a profit to LOTT of $1,000 per pound.

### October 30, 2008 - UC Purchases 7 Ounces of Crack Cocaine and 1 Ounce of Cocaine from LOTT after Recorded Drug-Related Calls over TARGET TELEPHONE 1 - Surveillance Identifies LOTT DTO Member Lawrence Kennedy NELSON

43. During a series of recorded calls with LOTT over **TARGET TELEPHONE 1**, I arranged for the purchase of approximately seven ounces of cocaine base and one ounce of powder cocaine on October 30, 2008. We agreed to meet at a Chevron gas station in Vallejo. During this drug deal, I was outfitted with a concealed recorder to document the drug deal with LOTT. Agents also videotaped and photographed the drug deal.

44. When LOTT arrived, he was the passenger in a rental vehicle driven by an individual subsequently identified as Target Subject Lawrence Kennedy NELSON. The other passenger in this Rental vehicle was identified as suspected LOTT DTO member Kenneth McCLAINE.

45. LOTT exited the vehicle and entered my vehicle. Inside my vehicle, LOTT produced a bag containing seven ounces of cocaine base and one ounce of cocaine. I paid LOTT the agreed-upon price of $7000.

46. After the drug deal, surveillance agents followed the rental vehicle directly back to Lawrence NELSON's residence at 324 Amelia Street, Vallejo. Officers then observed LOTT and McCLAINE enter a Suburban parked in front of the residence. Surveillance agents then followed the Suburban as it entered Highway 37 heading west in the direction of Sonoma and/or Novato.

47. The DEA Western Regional Laboratory subsequently analyzed the substances purchased from LOTT on October 30, 2008 and determined they contained 185.6 grams of cocaine base and 17.6 grams of cocaine.

### Background on LOTT DTO Member Lawrence Kennedy NELSON

48. After surveillance identified LOTT DTO member Lawrence Kennedy NELSON, I spoke with Vallejo Police Detectives Fabio Rodriguez and William Badour. They both have received specialized training in drug trafficking and are familiar with drug dealers in Vallejo. According to the detectives, Lawrence Kennedy NELSON, also known as "Bodine," is a

well-known cocaine base dealer living at 324 Amelia Street in Vallejo. As part of their investigation of Lawrence NELSON, the detectives received information that he stored large amounts of cocaine base in his garage. They subsequently obtained a search warrant for his residence at 324 Amelia Street in Vallejo.

49.    On April 11, 2008, detectives served the search warrant at NELSON's Amelia residence and seized approximately 36 grams of cocaine base hidden inside a video game console, baggies, scales, approximately $6,500 in small bills. The detectives arrested NELSON for possession of cocaine base for sale in violation of California law. NELSON subsequently posted bail and was released from custody.

50.    I reviewed NELSON's prior criminal history and learned the following:

a.    On or about January 28, 1991, Lawrence NELSON was convicted of two felonies for marijuana sales in violation of California Health Safety Code section 11360(a) and was sentenced to 180 days in jail and 3 years of probation for these offenses;

b.    On or about August 10, 1993, NELSON was convicted of felony convictions for possession of marijuana for sale and sales of marijuana in violation of California Health and Safety Codes sections 11359 and 11360(a), and was sentenced to 210 days in jail and 3 years probation for these offenses;

c.    On or about December 9, 1999, NELSON was convicted of felony offenses for possession of cocaine base for sale in violation California Health and Safety Code section 11351.5, and was sentenced to 5 years in prison for this offense.

**January 28, 2009 - UC Purchases 7 Ounces of Crack Cocaine from LOTT after Recorded Drug-Related Calls over TARGET TELEPHONE 1 - Surveillance Again Observes LOTT DTO Member Lawrence Kennedy NELSON**

51.    During a series of recorded calls with LOTT over **TARGET TELEPHONE 1** in January of 2009, I arranged to purchase seven (7) ounces of cocaine base from LOTT on January 28, 2009. We agreed to meet at a Chevron gas station in Vallejo for the drug deal.

52.    During the drug deal with LOTT on January 28, 2009, I was outfitted with a concealed recorder to document the drug deal with LOTT. Surveillance agents videotaped and photographed the drug deal.

53.    LOTT arrived and asked me to accompany him to his "spot" around the corner to obtain the cocaine base. LOTT told me that he trusted me enough to take me to his spot. I said that I was uncomfortable accompanying him to an unfamiliar location and wanted to conduct the drug deal at the Chevron gas station.

54. LOTT then drove directly to 324 Amelia Street. A few minutes later, surveillance agents observed LOTT DTO member Lawrence Kennedy NELSON drive LOTT from the Amelia residence directly back to the Chevron gas station. NELSON was again driving a rental vehicle. LOTT exited the rental vehicle and entered my vehicle. LOTT gave me a bag containing seven (7) ounces of cocaine base. In exchange, I paid him the agreed-upon price of $6400.

55. During our recorded drug deal, LOTT told me that I shouldn't be wary of him because he was well known throughout the world. LOTT said he operated THIZZ ENTERTAINMENT. LOTT said he had just appeared on the Jamie Foxx morning radio show in Los Angeles for their "American Gangster" segment. I subsequently obtained a copy of the Jaime Foxx segment from January 23, 2009, and LOTT did in fact appear on Jamie Foxx's Los Angeles-based radio show. During the interview, LOTT discussed the murder of Andre HICKS, also known as "Mac Dre," and the Romper Room Gang.

56. At the conclusion of the drug deal, surveillance agents followed LOTT in Lawrence Kennedy NELSON's rental vehicle directly back to NELSON's residence at 324 Amelia Street in Vallejo.

57. The DEA Western Regional Laboratory subsequently analyzed the substance I purchased from LOTT on January 28, 2009, and determined that it contained 190.1 grams of cocaine base.

**May 20, 2009 - UC Purchases 7½ Ounces of Crack Cocaine and 1 Ounce of Tar Heroin after Recorded Drug-Related Calls over TARGET TELEPHONE 1 - Surveillance Again Observes LOTT DTO Member Lawrence Kennedy NELSON - LOTT DTO Linked to Marijuana Dispensary Called NORTH BAY ALTERNATIVE HEALING**

58. During May of 2009, I engaged in a series of recorded calls with LOTT over **TARGET TELEPHONE 1**. During the recorded calls, I arranged to purchase seven and one-half ounces of cocaine base from LOTT. During our recorded discussions over **TARGET TELEPHONE 1**, I asked whether LOTT could obtain heroin. LOTT said he could obtain heroin and would be willing to provide me with an ounce sample during our upcoming drug deal. LOTT instructed me to meet him at the parking lot just inside the gated entrance to the Hiddenbrooke County Club and Golf Course in the hills of Vallejo.

59. On May 20, 2009, I was outfitted with a concealed recorder to document the drug deal with LOTT. Agents also videotaped the deal. LOTT arrived at this location in a vehicle driven by LOTT DTO member Lawrence Kennedy NELSON. The vehicle was registered to Lawrence NELSON's wife at 324 Amelia Street in Vallejo. LOTT exited this vehicle, entered my vehicle, and sold me 7½ ounces of cocaine base and one ounce of heroin for a total price of $5900.

60.  LOTT said that the price for cocaine base had decreased and that the heroin was only $600 per ounce. I told LOTT that I would take the cocaine base and heroin and try to convince my potential heroin buyer to purchase a large amount in the future. During our recorded meeting, LOTT emphasized his ability to purchase any amount of marijuana that I could deliver. LOTT specified that the marijuana for his partner who, LOTT said, operated the NORTH BAY ALTERNATIVE HEALING marijuana dispensary.

61.  After this drug deal, agents followed LOTT and Lawrence Kennedy NELSON directly to a residence within the Hiddenbrooke Country Club Estates at 7263 Willow Creek Circle, Vallejo, California. Agents believe that NELSON dropped LOTT off before leaving. Utility service at 7263 Willow Creek Circle was initiated in May of 2009 with a listed contact number matching **TARGET TELEPHONE 1**.

### June 3, 2009 - UC and LOTT Meet and Discuss Heroin, a LOTT DTO Marijuana Supplier, and Murder of Andre HICKS

62.  In June of 2009, LOTT placed a recorded call to me over **TARGET TELEPHONE 1**. During the recorded call, LOTT said that he was working in Auburn, California, he requested to meet with me. On June 3, 2009, I met with LOTT at a local restaurant. I wore a concealed audio recording device. During the recorded meeting, LOTT told me that he currently lived at a residence in a country club surrounding the golf course where he had met me in May 2009 (Hiddenbrooke Country Club Estates). LOTT asked me if my buyer liked the heroin and if he was interested in obtaining larger amounts. I agreed to try to speak with the buyer and arrange for a larger heroin deal in the near future.

63.  During the recorded meeting, we also discussed further his relationship with his partner at the marijuana dispensary. LOTT admitted that he was supplied by a friend of his who was a marijuana grower in nearby Grass Valley, California.

64.  LOTT also told me that he had been in Kansas City with his "brother" Mac Dre (Andre HICKS) when HICKS was murdered. LOTT also said that he was close friends with "Julio," the operator of the THIZZ LATIN label. During our meeting, LOTT wore a shirt displaying the emblem for THIZZ LATIN.

### August 11, 2009 - UC Purchases Half-Pound of Tar Heroin from LOTT After Recorded Calls over TARGET TELEPHONE 1 - Surveillance Observes LOTT DTO Members Eric ROBINSON and Earlissa ELLIS

65.  During a series of recorded calls with LOTT over **TARGET TELEPHONE 1** in August of 2009, I arranged to purchase eight (8) ounces of tar heroin from LOTT on August 11, 2009. LOTT instructed me to meet him at the parking lot just inside the gated entrance to the Hiddenbrooke Country Club.

66. During the drug deal, I was outfitted with a concealed recorder to document the drug deal with LOTT. LOTT subsequently arrived in a silver 2003 Mercedes Benz G55 SUV, registered to Simon Curtis NELSON, also known as "Kilo Kurt." LOTT told me that this vehicle had belonged to Andre HICKS, also known as "Mac Dre." LOTT also provided me with a "Mac Dre" DVD and a "Kilo Kurt" music CD. Both items were still contained inside the original packaging wrapper. LOTT told me that I should see what he was about. LOTT claimed that Simon Curtis NELSON was his brother.

67. After a period of time, LOTT told me that he needed to meet his individual with the heroin at a Valero gas station at Marine World Parkway and Broadway in Vallejo. LOTT asked me if I would accompany him to that location and wait nearby. I agreed.

68. After we both waited at the Valero gas station for an extended period of time, LOTT asked me to go back to the Hiddenbrooke Country Club. He said that he would meet with the source and have the heroin momentarily. I agreed. LOTT told me that the source for the heroin, a male, was almost back from obtaining the heroin and that he was going to meet him.

69. Surveillance agents stayed with LOTT. They watched him travel directly from the Valero gas station to a residence across the street and only a block away (180 Hogan Avenue, Vallejo). Surveillance agents observed LOTT entering the residence and, after a short period of time, a woman believed to be Earlissa ELLIS, was dropped off at this residence by another vehicle. LOTT was then observed exiting the residence with Eric Lesean ROBINSON, and the person believed to be LOTT DTO member Earlissa ELLIS. All three entered LOTT's silver Mercedes Benz SUV and drove in the direction of the Hiddenbrooke exit.

70. In the meantime, I relocated one exit east to the vicinity of the Jack in the Box restaurant at the Red Top Road exit of Highway 80 in Fairfield, California. During an unrecorded call to LOTT over **TARGET TELEPHONE 1**, I told LOTT to meet me at the Jack in the Box if he wished to conduct the drug deal. During this call, LOTT said he was at "the dude's" house right now and they were weighing it up. I interpreted this to mean LOTT was with his heroin supplier and was weighing out the eight ounces of heroin that I had ordered from LOTT. The timing of this comment to me was at approximately the same time that surveillance reported LOTT had entered ROBINSON's residence at the 180 Hogan address. Surveillance then observed LOTT drive directly to my location with ROBINSON and ELLIS inside his vehicle while the drug deal unfolded. He parked his vehicle and walked over to my car. ROBINSON and ELLIS remained in LOTT's car.

71. LOTT entered my vehicle and provided me with heroin and I gave him $5200. While inside my vehicle to conduct the drug deal, LOTT mentioned that he was going to take the money from this heroin deal back to his supplier. I interpreted this comment to mean, LOTT would provide a portion of the money from this heroin deal to Eric ROBINSON because

ROBINSON was sitting in LOTT's Mercedes at that time and LOTT's earlier comments ti me indicating that he go pick his heroin source and surveillance revealed LOTT picked up ROBINSON at ROBINSON's house shortly before our drug deal. After I gave LOTT the money for the heroin and LOTT gave the heroin, LOTT then returned to the Mercedes Benz and drove ROBINSON and ELLIS directly back to 180 Hogan Avenue in Vallejo where he dropped them off.

72. Surveillance agents then followed LOTT to the NORTH BAY ALTERNATIVE HEALING CENTER at 1516 Napa Street, Vallejo, California.

73. The DEA Western Regional Laboratory subsequently analyzed the substance I purchased from LOTT on August 11, 2009, and determined it contained 189 grams of heroin.

## Background on LOTT DTO Member Eric Lesean ROBINSON

74. After surveillance identified LOTT DTO member Eric ROBINSON, I spoke with Vallejo Police Detectives Fabio Rodriguez and William Badour. They both have received specialized training in drug trafficking and are familiar with drug dealers in Vallejo. According to the detectives, Eric ROBINSON, also known as "Pay Pay," is a well-known heroin and cocaine base dealer living at 180 Hogan Avenue in Vallejo.

75. I reviewed ROBINSON's prior criminal history and learned the following:

a. On or about May 3, 1999, ROBINSON was convicted of two felonies for possession of a controlled substance and possession of a controlled substance and a firearm, in violation of California Health Safety Code sections 11350 and 11370.1;

b. On or about August 6, 1999, ROBINSON was convicted of First Degree Robbery in violation of California Penal Code Section 211, and was sentenced to 7 years in prison, and that this conviction stemmed from an arrest for robbery of an inhabited dwelling, false imprisonment, threatening with intent to terrorize, possession of an assault weapon and burglary; and

c. I also learned that prior to this time ROBINSON had multiple arrests for possession of cocaine base for sale, transportation/sales of a controlled substance, battery, shooting at an inhabited dwelling and other crimes for which no adjudication was listed.

76. I was subsequently contacted by Vallejo PD Detective Fabio Rodriguez who related to me that on January 14, 2010, ROBINSON was arrested in the City of Vallejo Possession of Heroin for sale and Possession of a Controlled Substance while Armed with a Firearm, Assault with a Firearm on a Police Officer, Possession of a Controlled Substance for Sale, and Felon in Possession of a Firearm in violation of California law. I obtained a copy of the Vallejo PD Arrest Report, which Detective Rodriguez also summarized, and after reviewing this report I learned the following.

77. On January 14, 2010, Vallejo PD Officer Drew Ramsey approached a vehicle for a vehicle code violation (expired tags) in the City of Vallejo. ROBINSON abruptly exited the passenger side of the vehicle and was standing at the passenger door when Officer Ramsey approached. ROBINSON became verbally argumentative as the officer approached and began running away. Officer Ramsey chased ROBINSON on foot and a distance away observed him reaching to his waistband and pulling out a pistol. Officer Ramsey subsequently fired a shot from his own weapon at ROBINSON who fell to the ground. ROBINSON was not shot but he continued to fight with Officer Ramsey and another officer when they tried to subdue him, and he continued to reach underneath his person as they fought on the ground. After ROBINSON was subdued, Officer Ramsey located a .40 caliber Smith and Wesson Pistol and fifteen bags containing heroin. Following his arrest, ROBINSON subsequently posted bail and was released from custody. This case is still pending in Solano County.

### December 8, 2009 - UC Purchases Half-Pound of Cocaine Base from LOTT After Drug-Related Calls Over TARGET TELEPHONE 1 - Surveillance Observes LOTT DTO Member Lawrence Kennedy NELSON

78. During a series of recorded calls with LOTT over **TARGET TELEPHONE 1** during November and December of 2009, I arranged to purchase approximately eight (8) ounces of cocaine base on December 8, 2009. Leading up to the drug deal, on December 7, 2009, at approximately I spoke to LOTT in a recorded call over **TARGET TELEPHONE 1**. During the call, I asked LOTT, "Do you think it will be around eight?" LOTT replied, "It will probably be like eight-twenty-five (825), but if it is, I'll take, I'll take the strike for the last time." When I asked LOTT about the price of "eight," I was referring to the price for cocaine base being $800 per ounce. His response that, "it will probably be eight-twenty-five," means that the per-ounce price of cocaine base would be $825, but LOTT offered to absorb the $25 loss of profit per ounce of cocaine base on this upcoming drug deal. During the remainder of this recorded call over **TARGET TELEPHONE 1,** there was some confusion about whether we were discussing heroin (which was the previous drug deal and I referred to as "the black" during our conversation because I purchased tar heroin) or cocaine base, LOTT said, "Nah, you're talking about the old school thing." By "old school thing," I know that LOTT was referring to cocaine base based upon our subsequent drug deal on December 8, 2009.

79. At the conclusion of this recorded call, LOTT requested that I again meet him at the same Chevron gas in Vallejo. I agreed and, in preparation for the deal, I was outfitted with a concealed recorder to document the drug deal. Agents also videotaped and photographed the drug deal with LOTT.

80. Prior to the drug deal on December 8, 2009, LOTT told me during a recorded call over **TARGET TELEPHONE 1** that he was waiting near the Chevron gas station. Agents established surveillance of 324 Amelia Street (LOTT DTO member Lawrence Kennedy

NELSON's residence). A few minutes before the agreed-upon time for the drug deal, surveillance agents observed NELSON drive LOTT from 324 Amelia Street directly to the Chevron gas station. LOTT exited the vehicle and entered my vehicle. Inside, he produced a bag containing the eight ounces of cocaine base. I paid him the agreed-upon price of $6300.

81. During the recorded meeting, I told LOTT that my customer was interested in obtaining a half kilogram of cocaine and LOTT said a half kilogram of cocaine would cost approximately $13,000 to $14,000.

82. I also told LOTT that I was interested in obtaining methamphetamine. LOTT said he knew individuals who had methamphetamine available for sale and would get a price for ounces. After this drug deal, surveillance agents followed the vehicle directly back to Lawrence Kennedy NELSON's residence at 324 Amelia Street in Vallejo.

83. The DEA Western Regional Laboratory subsequently analyzed the substance I purchased from LOTT on December 8, 2009, and determined it contained 180.9 grams of cocaine base.

### Recorded Drug-Related Calls with LOTT over TARGET TELEPHONE 1 Between February 3, 2010, and March 1, 2010

84. During February of 2010, and March of 2010, I placed a series of recorded calls to LOTT over **TARGET TELEPHONE 1**, with the last recorded call occurring on or about March 1, 2010. A number of those calls are described below. During a recorded call with LOTT over **TARGET TELEPHONE 1** on or about February 3, 2010, at approximately 2:20 p.m., LOTT asked me whether I wanted "a whole thing" for an upcoming drug deal. In the context of this call, LOTT was asking whether I wanted to whole kilogram of cocaine. I replied that I wanted, "a half a thing," and asked if the price would be "12-5." LOTT replied, "yeah." In this portion of the call, I was telling LOTT that I wanted to purchase one-half kilogram of cocaine for $12,500. LOTT then said that he thought I was referring to "that girl." By "girl," LOTT meant my expressed interest in obtaining methamphetamine. I told LOTT that I would be interested in a "little date," to "check her out," meaning I would obtain a small amount of methamphetamine from LOTT to inspect the quality. LOTT confirmed that this was agreeable.

### February 6, 2010 - LOTT DTO Member Marico WHITEMON Murdered

85. According to Vallejo Police Department Detective Les Bottomely, on February 6, 2010, LOTT DTO member Marico WHITEMON was shot to death by unknown assailants in front of a liquor store near the entry point to the Crest. WHITEMON's murder is currently unsolved.

86. On or about February 13, 2010, at approximately 10:55 a.m., I made a recorded call to LOTT over **TARGET TELEPHONE 1**. During the recorded call, LOTT told me, "Bro, we just

buried one of my friends that I had a rap group with yesterday, man. He got killed at the liquor store last week, man." I believe LOTT was referring to the murder of LOTT DTO member Marico WHITEMON.

### Wire Interception of LOTT's Communications over TARGET TELEPHONE 1 Commence on March 20, 2010

87.   On March 18, 2010, the Honorable Judge Morrison C. England signed an order authorizing the wire interception of communications of Michael LOTT over **TARGET TELEPHONE 1**. DEA began intercepting calls on March 20, 2010.

88.   At the outset of the wiretap of calls over **TARGET TELEPHONE 1**, we intercepted numerous calls between LOTT and **Gaylord FRANKLIN** at (510) 395-6457. During these intercepted calls, LOTT and FRANKLIN discussed ongoing MDMA and marijuana trafficking activities. LOTT also discussed his supplying of marijuana to two local dispensaries, NORTH BAY ALTERNATIVE HEALING, operated by **Clifford BULLOCK, aka "Black,"** at 1516 Napa St, Vallejo, California, and the SOLACE HEATLH COLLECTIVE, also in Vallejo, operated by "John."

89.   I noted that FRANKLIN, also known as "Geezy," was a well-known music artist on the THIZZ ENTERTAINMENT label. A review of FRANKLIN's criminal history revealed numerous arrests for theft and robbery resulting in 2006 felony convictions for Burglary and Theft in Oakland, California. FRANKLIN's record also included arrests in Atlanta, Georgia, for Possession of Marijuana, Theft and Terrorist Threats, although no adjudication was available.

90.   On March 21, 2010, **TARGET TELEPHONE 1** received incoming intercepted calls from **Eileen Sherri KNIGHT** at (323) 822-6898. During these calls, LOTT asked KNIGHT if she brought any pills or syrup with her. She stated she left them at her house. Based on the conversation, and upon subsequent intercepted calls and undercover buys of oxycodone described below, I believe that LOTT was asking KNIGHT to determine if she was able to obtain unspecified amounts of oxycodone (trade name OxyContin) and Promethyzene syrup with Codeine (Purple Drank or Syrup). Based upon the content of these calls, it appeared that KNIGHT had traveled from Southern California and was staying in Vallejo at a local hotel. This telephone was subscribed in the name of KNIGHT at her listed address in Los Angeles, California.

91.   A review of KNIGHT's criminal history revealed that she had the following felony convictions:

a.   In 1994, a felony conviction in Contra Costa County for Burglary;

b.   In 2001, a felony conviction in Los Angeles for Fraud to Obtain Aid, and

c.   In 2008, a felony conviction in Los Angeles for Possession of Cocaine Base for Sale.

92.   On March 21 and 22, 2010, I placed intercepted telephone calls to LOTT over **TARGET TELEPHONE 1** and inquired regarding the price of a half-kilogram of cocaine and for MDMA. LOTT told me that it was "12-5" [$12,500.00 for a half kilogram of cocaine]. LOTT also related the type of MDMA tablets he had available for sale, e.g. BATMAN and TRANSFORMER emblem tablets. Agents intercepted LOTT contacting FRANKLIN over **TARGET TELEPHONE 1** during which LOTT indicated that he needed 1000 count quantities of MDMA shortly and FRANKLIN described his ability to supply the same types of MDMA tablets (red BATMAN/blue and green TRANSFORMER emblem tablets) that LOTT had described to me.

93.   I subsequently examined the telephone tolls for FRANKLIN's telephone during this time period and observed that several times when FRANKLIN indicated to LOTT that he was checking on the MDMA his telephone contacted a telephone (707) 712-1138, subscribed in the name of Major NORTON, also known as Dubee. NORTON is another well-known music artist on the THIZZ ENTERTAINMENT label.

94.   I have previously talked to several confidential sources during the course of this investigation who had stated that NORTON was a large scale MDMA, cocaine, and marijuana trafficker.

95.   I reviewed NORTON's criminal history and learned that in addition to numerous firearms arrests, NORTON's criminal history included the following:

   a.   On or about April 8, 2008, NORTON was convicted of a felony for felon in possession of a firearm in violation of California Penal Code section 12021;

   b.   On or about April 9, 2008, NORTON was sentenced to 16 months in prison and 4 years probation for this offense;

   c.   On about September 22, 2008, NORTON was convicted of a felony transportation/sales of a controlled substance (MDMA) in violation of California Health and Safety Code section 11379(a);

   d.   On or about September 22, 2008, NORTON was sentenced to term of 2 years in prison to run concurrent with his felon in possession conviction.

96.   As described below, NORTON was subsequently identified through additional intercepts, surveillance, car stops and undercover buys as a secondary MDMA source of supply to LOTT and FRANKLIN.

## Intercepted Wiretapped Calls Regarding LOTT's Ongoing Cocaine and Cocaine Base Trafficking with Bruce THURMON and Damian PETERSON

97.   On March 22, 2010, LOTT received numerous intercepted calls over **TARGET TELEPHONE 1** from people wanting to purchase various amounts of cocaine and cocaine base ("blow," "pow-pow"). LOTT discussed 1/16, 1/8, 1/4 ounce, and 1 ounce quantities for which he quoted various prices. LOTT told a particular female customer that he was about to

meet with "Dame," subsequently identified as Damian PETERSON, in order to obtain cocaine/cocaine base. Before and after this particular call, LOTT placed and received calls to and from (707) 704-2398, subscribed to **Damian Lamar PETERSON**. During these calls, LOTT told PETERSON that he needed him to bring him what he had asked for the previous evening. During subsequent intercepted calls, LOTT told PETERSON that he was at Eric ROBINSON's house in Vallejo and PETERSON agreed to meet him at that location to deliver the drugs.

98. I subsequently reviewed PETERSON's criminal history and learned that he had an extensive criminal history for offenses including the following:

   a. In 1992, a felony conviction for Robbery;

   b. In 1996, a felony conviction for Transportation/Sales of a Controlled Substance; and

   c. In, 2006, felony conviction for Transportation/Sales of a Controlled Substance, for which he was sentenced to 64 months state prison.

   d. I obtained the 2004 arrest report regarding the offenses for which PETERSON was ultimately convicted and sentenced in 2006. I learned that the Solano County Narcotics Enforcement Team (SOLNET) utilized a confidential source to purchase cocaine base from PETERSON and utilized this purchase to obtain a search warrant for PETERSON's residence. Upon executing this search warrant agents located 121 grams of cocaine base inside PETERSON's residence.

99. Following the last call with PETERSON, during which he indicated he was two minutes away from delivering the drugs to LOTT at ROBINSON's house, **TARGET TELEPHONE 1** placed an outgoing intercepted call to **Bruce Ezra THURMON II, aka "Little Bruce,"** at (707) 731-2743; this number is subscribed in the name Bruce THURMON.

100. THURMON is another well-known rap artist on the THIZZ ENTERTAINMENT label and LOTT was subsequently observed frequenting THURMON's residence and in his company during surveillance conducted during this wire intercept period. During the intercepted call, THURMON told LOTT that his mama just left so they just lit the dope. LOTT asked if THURMON still wanted "that thing" because he was having his guy bring it to him. THURMON told LOTT they already got it. LOTT told THURMON he needed to get his money back because he just "bought this shit." LOTT was very upset and hung up the phone. Two minutes later, **TARGET TELEPHONE 1** received an incoming intercepted call from THURMON at (707) 731-2743. During the call, LOTT told THURMON that he knew LOTT did not have any money but he made LOTT buy the cocaine anyway. THURMAN told LOTT to calm down and for LOTT to "bring me the blow so I can sell it for you" and make his money back. LOTT and THURMON agreed to meet at ROBINSON's house on Hogan Avenue shortly. LOTT also subsequently received another incoming call from an unknown female asking to purchase and amount of cocaine/cocaine base and he directed her to meet him at ROBINSON's house on Hogan Avenue as well.

101. I examined THURMON's criminal history record and observed that it included, but was not limited to the following:

    a.  In 1990, a conviction for Carrying a Loaded Firearm in a Public Place;

    b.  In 1990, a felony conviction for Possession of Cocaine Base for Sale; a 1993 felony conviction for Felon in Possession of a Firearm;

    c.  In 1994, a felony conviction for Felon in Possession of a Firearm; and

    d.  In 2008, a felony conviction for Felon in Possession of a Firearm.

### Intercepted Wiretapped Calls Between LOTT, Eileen KNIGHT, Basheba COOK, and Dante BARBARIN Regarding an Oxycondone Deal

102. On March 23, 2010, **TARGET TELEPHONE 1** received an incoming intercepted call from Eileen KNIGHT using (323) 822-6898. During the call, KNIGHT told LOTT her folks had "150" of them and asked if LOTT wanted them. LOTT asked if they were "80's," referring to the 80 mg prescription strength of an OxyContin (oxycodone) pill. KNIGHT told LOTT yes and then instructed LOTT not to use such a term over the phone. LOTT asked if the pills were 25, i.e. $25 each. KNIGHT told LOTT she would call her source and find out what the source wanted. KNIGHT told LOTT she would come down if LOTT's boy wanted the pills.

103. A few minutes later, **TARGET TELEPHONE 1** received an incoming intercepted call from KNIGHT using (323) 822-6898. During the call, KNIGHT attempted to conduct a three-way telephone call between her, LOTT, and her source, whom she referred to as PEBBLES, later identified as Besheba COOK. KNIGHT told LOTT that COOK should be on the line, but the telephone call got disconnected. The number that KNIGHT's telephone attempted to contact during this call and during subsequent calls described below was subscribed to COOK in West Sacramento.

    a.  A review of COOK's criminal history revealed that her known listed moniker was "PEBBLES" and that that she had an extensive arrest record for offenses including possession of a controlled substance for sale.

104. At 10:08 a.m. (approximately a minute after the disconnected call with KNIGHT and COOK), **TARGET TELEPHONE 1** received an incoming intercepted call from Dante Toriano BARBARIN from a telephone subscribed in BARBARIN's name. During the call, LOTT told BARBARIN that his home girl (KNIGHT) had "150 [oxycodone pills] of them, the 80 disk." BARBARIN asked LOTT what the price was. LOTT told BARBARIN that he wanted to make something and asked BARBARIN how much LOTT should pay for the pills so LOTT could make a profit. BARBARIN told LOTT to get it as low as he could so he would make everything. BARBARIN said others spend around 24 or 25 ($24.00 or $25.00 per pill). LOTT stated he would find out.

105. At 10:09 a.m., **TARGET TELEPHONE 1** placed an outgoing intercepted call to KNIGHT. During the call, LOTT asked KNIGHT how much she was going to charge him for the oxycodone pills. KNIGHT stated 30 [$30.00 per pill]. LOTT told KNIGHT he could not do that price. LOTT stated he was not going to make anything off of it and that [$30.00] was the price he was going to charge his customer. KNIGHT said she could tell COOK it would be 25 [$25.00 per pill]. LOTT told KNIGHT to tell COOK it would be 20 [$20.00 per pill] so KNIGHT could make something off of it. KNIGHT stated she was not going to try to make anything off it because that was the price the pills were already going for. KNIGHT stated she would call COOK and ask if she would do 25.

106. At 10:10 a.m., **TARGET TELEPHONE 1** received an incoming intercepted call from BARBARIN. LOTT told BARBARIN that KNIGHT wanted him to give her 25 so he would have to try 30 to make something off it. BARBARIN told LOTT not to mess with that because it was too much. LOTT stated he would not make anything at 25. BARBARIN told LOTT to tell KNIGHT at least 23 so he could make 2 in between. BARBARIN told LOTT that if LOTT could get it for 23, then LOTT could sell it to "Jim" or anybody because people would buy it for 24 or 25 and LOTT would make something.

107. At 10:27 a.m., **TARGET TELEPHONE 1** received an incoming intercepted call from KNIGHT. During the call, KNIGHT told LOTT she had PEBBLES (COOK) on the line, with a three-way telephone call. LOTT told COOK that his customer only had exactly 25 a piece for the 150 [oxycodone pills] so he was going to get it and not make anything off it. LOTT asked COOK if she was going to come to town. COOK affirmed. LOTT told COOK that as soon as he received his customer's money, he would call COOK. LOTT told COOK his customer said around 12:00 o'clock and that it was a sure thing.

108. At 12:40 p.m., **TARGET TELEPHONE 1** received an incoming intercepted call from Besheba COOK at (510) 776-5076. During the call, LOTT asked COOK where she was at and COOK stated she was in Sacramento. LOTT asked COOK how much [the oxycodone pills] were going to cost. COOK stated she did not know and she needed to do some quick calculations, adding it was going to cost thousands. LOTT asked if it was 3750 [150 pills multiplied by $25.00 each equals $3750.00]. COOK stated she believed it was more than that and she would do a quick calculation and call LOTT back.

109. At 12:43 p.m., **TARGET TELEPHONE 1** received an incoming intercepted call from COOK who stated it [the pills] would cost $3750. LOTT stated that was what he just told her. LOTT told COOK he would call his customer and see where he was located.

110. At 2:26 p.m., **TARGET TELEPHONE 1** received an incoming intercepted call from BARBARIN. During the call, LOTT told BARBRIN that his oxycodone source was going to give him the pills for 24.50 ($24.50) and asked if BARBARIN's people wanted them for 25 ($25.00). BARBARIN stated he called his dude and the dude had a buyer that wanted to do 15. BARBARIN stated his dude would be calling him later today. LOTT said his source had 150 of them and the source wanted to sell them all at once.

111. I subsequently called LOTT in following months and inquired if he could obtain Oxycodone, which he stated he could obtain in 80 mg tablet form from his female source in Southern California. Toll information revealed that LOTT consistently called KNIGHT during the times of my calls. As described below, I purchased several hundred green 80 mg OC-type Oxycodone pills from LOTT in December of 2010 at which time he was accompanied to the transaction by KNIGHT, from whom he was observed obtaining the Oxycodone. Based upon all this, I believe that all of the above listed calls detailed LOTT's efforts to broker a large Oxycodone deal between Eileen KNIGHT/Besheba COOK and Dante BARBARIN.

112. I know from my investigation and from talking to confidential sources that BARBARIN is a long-time member of THIZZ ENTERTAINMENT and an associate of LOTT, Simon Curtis NELSON and Andre "Mac Dre" HICKS. I also know that BARBARIN was identified as a member of the Romper Room bank robbery group which evolved into THIZZ ENTERTAINMENT and that BARBARIN has a 1993 felony conviction in the Northern District of California for Armed Bank Robbery and Use of a Firearm in Furtherance of a Crime of Violence, and was sentenced to 137 months in federal prison. In addition, BARBARIN's criminal history includes felony convictions for Transportation/Sales of a Controlled Substance, Possession of a Controlled Substance, Possession of Marijuana for Sale, and Felony Evading, in addition to arrests for Possession of Cocaine Base For Sale, Assault with a Firearm on a Police Officer, Robbery and other offenses.

113. Inquiries with the California Department of Justice (DOJ) revealed that COOK has an extensive criminal history for offenses including the following:

   a. In 1987, a felony conviction for Burglary for which she was sentenced to 1 year jail; and

   b. In 2000, a felony conviction for Robbery for which she was sentenced to 3 years probation.

114. I also noted that on March 25, 2010, when I was placed calls to LOTT attempting to purchase 4000 MDMA tablets, LOTT made multiple intercepted calls over **TARGET TELEPHONE 1** to BARBARIN asking him if he could obtain "4000 skittles" on extremely short notice when LOTT believed his main sources (described below) might not deliver the MDMA on time that day.

115. I know from my training and experience that "skittles" is a common reference to MDMA tablets. My interpretation of this term is corroborated by the fact that LOTT used this term when he was speaking to me about MDMA tablets during undercover conversations.

116. During the intercepted call on March 25, 2010, BARBARIN told LOTT that he (BARBARIN) would call his sources and might be able to obtain the MDMA tablets on such short notice. BARBARIN related that he was waiting on a call back from his MDMA source just prior to LOTT conducting the MDMA transaction with Nicholas RAMIREZ.

**March 24, 2010 – Drug-Related Intercepted Wiretap Calls Between LOTT, FRANLKIN, NELSON, and Narco McFARLAND, Sr.**

117. On March 24, 2010, I telephonically contacted LOTT to discuss the possibility of purchasing up to a ½ kilogram of cocaine and/or 4000 MDMA tablets the following day.

118. Following my calls, LOTT was intercepted over **TARGET TELEPHONE 1** contacting several individuals regarding obtaining this cocaine and MDMA. LOTT was intercepted speaking to Lawerence NELSON informing him that I would possibly want nine or more ounces of cocaine. LOTT was also intercepted speaking with FRANKLIN who stated he could obtain 1000 count quantities of MDMA of various types, including red Batman Pills and Lexus emblem pills, the following day.  During these discussions, FRANKLIN discussed the possibility of LOTT and Gaylord FRANKLIN obtaining multiple 1,000-count quantities of MDMA from "White Boy" (RAMIREZ) and "Killa" (Marcus DAVIS).  However, FRANKLIN indicated that he believed that he could obtain the MDMA at a slightly cheaper price from FRANKLIN's preferred MDMA supplier. Based upon toll analysis of FRANKLIN's calls that day, as well as subsequent intercepts and surveillance on later dates, I believe FRANKLIN was referring to Major NORTON.

119. At approximately 8:26 a.m. on March 24, 2010, LOTT was intercepted over **TARGET TELEPHONE 1** speaking with an individual subsequently identified as Narco McFARLAND, Sr. using telephone (707) 712-3389. This telephone is subscribed to an elderly female at an address in Vallejo which McFARLAND has repeatedly provided as his resident address, including to the California DMV. Detective Les Bottomley of the Vallejo Police Department related to me that during two separate Homicide investigations during 2010 he had verified that this number was utilized by Narco McFARLAND, Sr., including during the homicide investigation regarding the death of Narco McFARLAND Jr. (described below) and the homicide of Christopher HICKS.

120. During the intercepted call referenced in the paragraph above, McFARLAND, Sr. told LOTT that he had a customer from Chicago who was in town who had $20,000 to purchase marijuana. LOTT indicated he could obtain the marijuana from BULLOCK at NORTH BAY ALTERNATIVE HEALING and that they could take the customer to the club and count the money in the lobby. During multiple subsequent intercepted calls that same day over **TARGET TELEPHONE 1**, LOTT asked McFARLAND about obtaining amounts of powder cocaine and tar heroin. McFARLAND indicated he could take care of LOTT.

121. I examined McFARLAND, Sr.'s criminal history record and it includes the following:

    a.  In 1996, a felony conviction for Assault with a Firearm on a Person and Willful Discharge of a Firearm in a Negligent Manner, resulting in an 8 year prison sentence; and

    b.  In 2005, a felony conviction for Evading a Police Officer – Disregarding Safety.

122. That same evening, I called LOTT over **TARGET TELEPHONE 1** and confirmed that I would only want a quarter pound of cocaine base, as opposed to the powder cocaine, in addition to the MDMA, the following day. LOTT was subsequently intercepted over **TARGET TELEPHONE 1** contacting NELSON, who said he already had that amount of cocaine base. LOTT also was intercepted contacting Damian PETERSON. During this call, LOTT informed PETERSON that he would have something for him (believed to be powder cocaine based upon prior intercepts) that evening or the following day. PETERSON indicated he would wait for LOTT's call.

## March 25, 2010 – UC Purchases MDMA Pills and Cocaine Base from LOTT  - Intercepted Wiretap Calls Reveal MDMA Pills Supplied by Nicholas RAMIREZ and Marcus DAVIS, and Cocaine Base Supplied by Lawrence NELSON

123. During the early morning hours of March 25, 2010, LOTT was intercepted contacting FRANKLIN to advise him that I was arriving early the next morning to obtain MDMA. FRANKLIN indicated his source was not going to be available till later in the day. At approximately 10:42 a.m., LOTT was intercepted calling the number to NORTH BAY ALTERNATIVE HEALING and speaking with BULLOCK, asking if he could quickly obtain "four boats of skittles," i.e. 4000 MDMA tablets. BULLOCK indicated he didn't think so. Shortly after this call, LOTT was intercepted calling BARBARIN (as described above), asking the same question, to which BARBARIN indicated he would make some calls.

124. LOTT was subsequently intercepted making multiple calls to (510) 375-9460 and speaking to "Narco," subsequently identified as Narco McFARLAND Jr.  During the intercepted call, LOTT asked McFARLAND Jr. if he could call his "guy" to get 4000 MDMA tablets and they exchanged multiple phone calls. McFARLAND Jr. subsequently called LOTT back and gave him the telephone number to "White Boy Nick," which he related as (707) 712-2132. This individual was identified as Nicholas RAMIREZ and this number was subsequently designated as **TARGET TELEPHONE 2**.

125. McFARLAND Jr., who had an extensive criminal history, was murdered later in 2010.

126. During subsequent intercepted calls by LOTT over **TARGET TELEPHONE 1** to Nicholas RAMIREZ using **TARGET TELEPHONE 2** at approximately 12:53 p.m. on March 25, LOTT was intercepted telling RAMIREZ that he (LOTT) needed 4000 MDMA pills for a buyer who was traveling to the area. RAMIREZ told LOTT that he was going to meet his MDMA supplier in Oakland that afternoon and could supply as much MDMA as LOTT's buyer wanted that evening.  LOTT told RAMIREZ that he had to give the buyer some MDMA at that time to convince him that the rest of the MDMA would be delivered later in the day. During the intercepted call between LOTT and RAMIREZ over **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2,** RAMIREZ told LOTT that "Killa" (Marcus DAVIS) most likely had approximately 500 pills left at his residence.  RAMIREZ said he would check with DAVIS.

127. Subsequent telephone toll records revealed that after RAMIREZ's intercepted comments to LOTT, at approximately 12:54 p.m., the next call **TARGET TELEPHONE 2** made was to a cellphone subscribed in the name of "Mario JOHNSON," and subsequently identified as

being utilized by Marcus DAVIS, aka "Killa." After the toll record connection between RAMIREZ and DAVIS, RAMIREZ called LOTT back. During an intercepted call between LOTT and RAMIREZ over **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2,** RAMIREZ told LOTT to go to DAVIS in order to obtain the initial amount of MDMA. RAMIREZ said the MDMA pills were "green Playstations" - meaning green MDMA pills stamped with an icon for the Sony Playstation game console. LOTT told RAMIREZ that they would have to deliver the remaining MDMA pills to me that evening. RAMIREZ agreed to this arrangement.

128. Surveillance subsequently observed LOTT traveling with his cocaine base supplier (Target Subject Lawrence Kennedy NELSON) from NELSON's house at 324 Amelia Street directly to the residence of "Mario JOHNSON" at 601 Mark Street, Vallejo, California. At 601 Mark Street, agents observed Marcus DAVIS enter their vehicle and accompany them directly to a Chevron Station in Vallejo, California where LOTT delivered approximately one quarter pound of cocaine base and 600 MDMA pills to me. LOTT indicated that the larger bag contained approximately 500 MDMA tablets which were green Playstation emblem pills.

129. I paid LOTT $4,460 for the cocaine base and MDMA. LOTT said he would deliver the remaining amount (approximately 3,400 MDMA pills) to me in Sacramento later that evening. Following this initial exchange, agents observed their vehicle proceed directly back to DAVIS's residence. DAVIS was dropped off at the residence.

130. The DEA Western Regional Laboratory subsequently identified the substance purchased as being 137.9 grams of a substance and mixture containing MDMA and methamphetamine.

131. Following this drug deal, agents monitored intercepted calls between LOTT using **TARGET TELEPHONE 1** and RAMIREZ using **TARGET TELEPHONE 2** throughout the afternoon. For example, on March 25, 2010, at approximately 3:40 p.m., LOTT contacted RAMIREZ in an intercepted call over **TARGET TELEPHONE 2** and asked whether RAMIREZ was going to be able to supply the remaining "35" (3,500 pills). During the intercepted call, RAMIREZ said he was in San Francisco and he would be meeting his source in Oakland to "snatch them motherfuckers" and would be on his way to meet LOTT.

132. Telephone toll analysis of **TARGET TELEPHONE 2** revealed that the next two telephone calls which **TARGET TELEPHONE 2** made at 3:47 p.m. and 3:48 p.m. were to telephone (510) 705-2191. Toll analysis showed that this was the only the "510" area code number (which corresponds to the area code in the Oakland area) that **TARGET TELEPHONE 2** called during the entire period between 3:00 p.m. and approximately 9:00 p.m. during which RAMIREZ indicated that he was speaking to his supplier in Oakland. According to toll record analysis, at approximately 4:55 p.m., **TARGET TELEPHONE 2** called (510) 705-2191. Immediately following this call, at approximately 4:57 p.m., RAMIREZ was intercepted contacting LOTT from **TARGET TELEPHONE 2** and asking LOTT if he was certain that the buyer still wanted the remaining amount of MDMA pills. LOTT confirmed that he still needed the MDMA pills and reminded RAMIREZ that they would have to go together to Sacramento to deliver the pills. During the intercepted call, RAMIREZ said he was in San Francisco but had arranged to go meet the source. RAMIREZ told LOTT that his supplier was stressing him out and wanted the money for the drugs back the same day.

RAMIREZ also told LOTT that he was meeting the source in Oakland before coming to meet LOTT. At approximately 5:16 p.m. on March 25, 2010, **TARGET TELEPHONE 2** received an incoming call from (510) 705-2191. At approximately 5:33 p.m., LOTT used **TARGET TELEPHONE 1** to contact RAMIREZ over **TARGET TELEPHONE 2** in an intercepted call. During the intercepted call, RAMIREZ confirmed that the pills he would be delivering to LOTT would be blue and green "Playstations" - meaning blue and green MDMA pills stamped with the logo of Sony Playstation. RAMIREZ also said the pills contained a few yellow "PL" emblem pills.

133. At approximately 5:45 p.m. and again at 6:00 p.m., **TARGET TELEPHONE 2** received incoming calls from (510) 705-2191. At approximately 6:10 p.m., RAMIREZ used **TARGET TELEPHONE 2** to contact LOTT over **TARGET TELEPHONE 1** in an intercepted call. During the intercepted call, RAMIREZ said he was just leaving the Oakland area on his way to meet LOTT in Vallejo with the pills. Approximately thirty minutes later, surveillance agents observed RAMIREZ arrive at the Vallejo location described by LOTT (Bruce THURMON's residence) during an intercepted call. Agents observed LOTT pick up RAMIREZ in his vehicle. LOTT and RAMIREZ then drove to Sacramento.

134. According to toll records, at approximately 7:53 p.m., **TARGET TELEPHONE 2** contacted telephone (510) 705-2191. At approximately 7:55 p.m., agents observed RAMIREZ and LOTT exit the freeway in Sacramento heading toward the agreed-upon location for the drug deal with me acting as the UC (a Home Depot located near the intersection of Highway 50 and Power Inn Road). As the vehicle approached my location, I observed RAMIREZ park his vehicle near my vehicle. RAMIREZ exited the driver's side, opened the hood, and removed a bag from the engine compartment. RAMIREZ handed the bag to LOTT. LOTT then walked over to me and gave me the bag. I subsequently determined that the bag contained approximately 3,400 MDMA tablets. After LOTT handed me the bag, I provided LOTT with $9,980. Consistent with RAMIREZ's intercepted description of the pills, the pills that LOTT sold me consisted of 3,000 blue and green MDMA pills stamped with a "Playstation" logo and 400 yellow pills bearing a "PL" emblem.

135. Following this drug deal, LOTT returned to RAMIREZ's vehicle and they left. According to toll records, at approximately 8:00 p.m., **TARGET TELEPHONE 2** received an incoming telephone call from (510) 705-2191. Surveillance agents followed LOTT and RAMIREZ directly back from Sacramento to Vallejo where they parked at the residence of DAVIS at 601 Mark Street.

136. The DEA Western Regional Laboratory subsequently identified the substance purchased as being 774.6 grams of a substance and mixture containing MDMA and methamphetamine.

137. Based upon the content of the intercepted calls between LOTT and RAMIREZ (described above) and the timing and pattern of calls from toll records of **TARGET TELEPHONE 2**, I believe that RAMIREZ was contacting his source of supply for MDMA at cellular telephone (510) 705-2191. This person was subsequently identified as **Phat NGUYEN**, the subscriber of this telephone. As described below, RAMIREZ was later intercepted arranging to purchase MDMA from NGUYEN and was observed obtaining MDMA from NGUYEN which was later located during more than one seizure.

138. Later that same evening, as LOTT and RAMIREZ were driving back to Vallejo, LOTT was intercepted contacting FRANKLIN to inquire whether FRANKLIN could provide "one boat," e.g. 1000 MDMA tablets, for a customer who was coming to obtain them. FRANKLIN was upset that LOTT had had gone to RAMIREZ to obtain MDMA earlier in the day and asked why RAMIREZ wasn't taking care of it. FRANKLIN finally agreed to provide the 1000 MDMA tablets. LOTT was then intercepted contacting McFARLAND, Sr. and stating that they only had 600 tablets left and asked if he could wait until the morning to obtain the MDMA, which McFARLAND, Sr. agreed to. LOTT later contacted FRANKLIN and let him know the MDMA he had just requested was for "Narc." LOTT was also intercepted contacting McFARLAND Jr. and thanking him for putting him in contact with RAMIREZ.

### March 26, 2010 – Intercepted Calls Reveal MDMA Deal Involving Gaylord FRANKLIN and Narco McFARLAND, Sr.

139. On March 26, 2010, at 10:06 a.m., **TARGET TELEPHONE 1** placed an outgoing intercepted call to FRANKLIN at (510) 395-6457. During the call, FRANKLIN told LOTT he had Red Batmans [MDMA pills that are red in color and stamped with the Batman logo]. At 10:31 a.m., **TARGET TELEPHONE 1** received an incoming intercepted call from FRANKLIN. During the call, FRANKLIN told LOTT he was sitting on three boats of MDMA pills [3000 MDMA pills]. LOTT told FRANKLIN that he needed one boat [1000 MDMA pills].

140. At 10:45 a.m., **TARGET TELEPHONE 1** received an incoming intercepted call from Narco McFARLAND, Sr. from (707) 712-3389. During the call, McFARLAND, Sr. said a third party wanted to test the MDMA pills. LOTT told McFARLAND they were sealed in a pack and could not be opened and for McFARLAND to tell his customer the pills were Red Batmans.

141. LOTT was subsequently intercepted calling FRANKLIN and telling him that McFARLAND's people wanted to test the MDMA and open a package. FRANKLIN declined this proposal. LOTT was intercepted arranging to meet with FRANKLIN around the corner from McFARLAND, Sr.'s residence at approximately 1:45 p.m. FRANKLIN was then intercepted indicating he was in a taxi cab at a particular location in route to this location. Later that day, LOTT was intercepted contacting RAMIREZ over **TARGET TELEPHONE 2** to inquire about obtaining MDMA. LOTT then contacted McFARLAND to tell him that he was waiting on RAMIREZ to get off of work so that he could get "the extra."

142. In addition, McFARLAND, Sr. was intercepted numerous times between March 26, 2010, and the expiration of the intercept of **TARGET TELEPHONE 1**, conducting calls with LOTT in which LOTT inquired regarding the availability of cocaine and McFARLAND inquired regarding LOTT obtaining additional large amounts of marijuana from Clifford BULLOCK on his behalf.

## Mikel BROWN's Intercepted Calls with LOTT About Obtaining Cocaine and Crack Cocaine

143. During interception of LOTT's call over **TARGET TELEPHONE 1,** agents intercepted LOTT speaking with an individual subsequently identified as Mikel Renier BROWN using telephone (707) 333-3209. This number was subscribed in the name of Mikel R. BROWN at a Vallejo address which BROWN had provided in the past. During initial intercepted calls between LOTT and BROWN, the two discussed the fact that he was traveling to Texas. During subsequent intercepted calls between LOTT and BROWN, they discussed that BROWN was catching an airline flight back from Texas to California on March 27, 2010.

144. I subsequently learned through NCIC inquiries that BROWN had an extensive criminal history in Texas for offenses including the following:

   a. In 1983, a felony conviction for five counts of aggravated robbery with a firearm, for which he was sentenced to 15 years prison;

   b. In 1989, a felony conviction for burglary, for which he was sentenced to 5 years prison; and

   c. In 1993, a felony conviction for fraud and burglary, for which he was sentenced to 10 years prison and 20 years prison, respectively.

   d. Texas DOJ records also showed arrests for Possession of Cocaine for Sale and other offenses resulting in revocation of parole.

   e. Inquiries with the California DOJ revealed that BROWN had been paroled from Texas to California and that over the years BROWN had been arrested for Possession of Marijuana for Sale, DUI and Vehicle Theft charges resulting in misdemeanor convictions.

145. On March 27, 2010, at 3:27 p.m., **TARGET TELEPHONE 1** received an incoming intercepted call from BROWN. BROWN left a voice message on LOTT's phone stating he needed some "soft" AND some "hard," "half and half." In my training and experience, BROWN is referring to both powder cocaine (soft) and crack cocaine (hard) and he would like to supply both forms of the drugs. At approximately 4:53 p.m., LOTT contacted BROWN back and told him that he would try to get the "half-and-half" together for BROWN.

146. On March 29, 2010, at 6:57 p.m., **TARGET TELEPHONE 1** made an outgoing intercepted call to BROWN. BROWN asked LOTT to get him a "quarter." In my training and experience, this is consistent with a reference to an order for either a quarter pound or a quarter kilogram of drugs.

147. At 7:35 p.m., **TARGET TELEPHONE 1** made an outgoing intercepted call to BROWN. During the intercepted call, LOTT said he had obtained the cocaine but that it was "soft," i.e. powder cocaine, and they didn't have any "hard," i.e. crack cocaine. I believe LOTT was referring to powder cocaine as opposed to crack cocaine. BROWN said he hadn't waited for

LOTT. LOTT asked BROWN to take at least three, that he could have five, because LOTT
needed the money for a show he was putting on. I believe LOTT was indicating that
BROWN could convert three ounces of powder cocaine into five ounces of crack cocaine.
BROWN stated that another individual was supposed to have a "key" [a kilogram of cocaine]
for him. LOTT again asked BROWN to take the cocaine LOTT had available because he
needed the money. BROWN agreed to purchase the cocaine LOTT could provide in order to
help LOTT out. BROWN told LOTT to come to BROWN's house.

148. At 6:04 p.m., **TARGET TELEPHONE 1** received an incoming intercepted call from
MIKEL at (707) 333-3209. MIKEL told LOTT he was going to be at the house in ten
minutes and asked where LOTT wanted to meet. LOTT told MIKEL to go to the Chevron
gas station by the CREST. MIKEL stated he would be there in five minutes.

149. On April 3, 2010, at 5:36 p.m., **TARGET TELEPHONE 1** received an incoming
intercepted call from BROWN. BROWN told LOTT that he needed "half and half" [an order
consisting of half cocaine and half crack cocaine]. At 6:04 p.m., LOTT contacted BROWN
in an intercepted call. During the intercepted call, BROWN told LOTT he was at the light,
about to make a left [to come meet LOTT for a transaction.] At 7:52 p.m., **TARGET
TELEPHONE 1** received an incoming intercepted call from BROWN. BROWN asked
LOTT how much to sell the cocaine for and discussed whether he was going to break it down
any further. LOTT told BROWN that he could sell the rocks (cocaine base) as is for $10 and
$20 per rock.

### March 31, 2010 – Marijuana and MDMA Deal – LOTT Obtains 1000 MDMA Pills from Gaylord FRANKLIN and Major NORTON – LOTT Sells MDMA Pills to Clifford BULLOCK

150. On March 31, 2010, at 1:36 p.m., **TARGET TELEPHONE 1** received an incoming
intercepted call from Narco McFARLAND, Sr. During the intercepted call, McFAFRLAND
asked LOTT if LOTT could give him "five p's of Kush" [five pounds of a marijuana strain
known as the "Kush"]. LOTT asked McFARLAND, Sr. if he called "Black." During the
investigation, agents identified "Black" as Clifford Tamirr BULLOCK, III.

151. BULLOCK is listed as the president for the NORTH BAY ALTERNATIVE HEALING
Corporation, a marijuana dispensary located at 1516 Napa Street in Vallejo. During the
intercepted call between McFARLAND, Sr. and LOTT on March 31, 2010, McFARLAND,
Sr. confirmed that he did call BULLOCK and BULLOCK said he was trying to get the
marijuana. LOTT seemed to imply that he (LOTT) would call another source and get back to
McFARLAND.

152. At 1:38 p.m. on March 31, 2010, **TARGET TELEPHONE 1** made an outgoing intercepted
call to the SOLACE HEALTH COLLECTIVE. This is another marijuana dispensary located
in Vallejo. LOTT spoke to "John." During the intercepted call, LOTT asked "John" if
LOTT could get "five p's of Kush." John said it could be done today. LOTT said he needed a
good price. John asked if LOTT wanted a "whole" or a "zip piece." In my training and
experience, I believe John was asking LOTT if he wanted whole pounds of marijuana, or or

pounds made up of individual ounces. LOTT told John that he wanted "five p's." John said he [a third party] wanted 36 [$3600 per pound] for it. LOTT said he would call John back.

153. At 1:39 p.m. on March 30, 2010, **TARGET TELEPHONE 1** made an outgoing intercepted call to Narco McFARLAND, Sr. During the intercepted call, LOTT told McFARLAND, Sr. that it was going to be about 36 or 37 [$3600 or $3700 per pound of marijuana]. McFARLAND, Sr. said those were good prices and asked if the marijuana was "Kush." LOTT told McFARLAND, Sr. that LOTT just had to go to the club and get them. LOTT told McFARLAND, Sr. to get the money. During a portion of the intercepted call, McFARLAND, Sr. seemed to ask LOTT if he was referring to one cannabis club. LOTT answered in the negative and said it was the other club downtown, LOTT's other partner [referring to SOLACE HEALTH COLLECTIVE as opposed to BULLOCK's dispensary called NORTH BAY ALTERNATIVE HEALING]. McFARLAND, Sr. said he would come get LOTT.

154. At 1:44 p.m., **TARGET TELEPHONE 1** received an incoming intercepted call from Narco McFARLAND, Sr. During the intercepted call, McFARLAND, Sr., asked LOTT if they had it [the five pounds of marijuana]. LOTT stated he had to go to the dispensary. LOTT asked McFARLAND, Sr. when he wanted to do it. McFARLAND, Sr. stated he was at Denny's and he would come get LOTT, but he was waiting for someone else because he did not have a car.

155. At 1:45p.m., **TARGET TELEPHONE 1** made an outgoing intercepted call to the SOLACE HEALTH COLLECTIVE. LOTT spoke to "John" and told him that LOTT's money source [McFARLAND, Sr.] was going to bring him the "loot." John said he had to call a third party and the marijuana would not be ready until 6:00 o'clock.

156. At 1:51 p.m., **TARGET TELEPHONE 1** made an outgoing intercepted call to a male subject identified as "Rob." LOTT asked Rob if he knew anyone that had "five pounds of Kush." Rob said he did not. LOTT said his customer had the money ready. LOTT asked Rob to make a few calls for him. Rob said he would see what he could do for LOTT. Rob claimed he could probably get some "sour diesel" [a strain of marijuana different from the "Kush" strain being sought by LOTT in these intercepted calls]. LOTT asked if they looked like "Kush." Rob stated he did not know and he would go see it.

157. At 2:26 p.m. on March 30, 2010, **TARGET TELEPHONE 1** made an outgoing intercepted call to the SOLACE HEALTH COLLECTIVE. During the intercepted call, LOTT spoke to "John" and asked him if the five pounds of "Kush" would be there by 6:00 p.m., as LOTT's customer would leave if the customer could not get the marijuana. John stated he was waiting for his source to call him and he would know in the next thirty minutes.

158. At 2:39 p.m. on March 30, **TARGET TELEPHONE 1** made an outgoing intercepted call to Rob. Narco McFARLAND, Sr. used **TARGET TELEPHONE 1** to speak to Rob. McFARLAND, Sr. asked Rob what happened to the five pounds of marijuana. Rob said nothing and he would check with BULLOCK. LOTT came on the telephone at the end of the call. Agents believe "Rob" is Robin PRASAD, the identified manager at NORTH BAY ALTERNATIVE HEALING, which is owned and operated by Clifford BULLOCK.

159. At 4:15 p.m., **TARGET TELEPHONE 1** received an incoming intercepted call from BULLOCK from a cellular telephone using phone number (510) 779-8156. During the intercepted call, BULLOCK told LOTT he wanted "some of them Diesels" and that he needed "a boat," that is, 1000 MDMA pills. I believe BULLOCK was asking LOTT for a large amount of marijuana (diesel being the slang name for a strain of marijuana) and 1000 MDMA pills during this call.

160. At 6:09 p.m. on March 30, 2010, **TARGET TELEPHONE 1** made an outgoing intercepted call to Nicholas RAMIREZ. LOTT asked RAMIREZ if he had "a boat." RAMIREZ said he did not, but he could get one. RAMIREZ stated he would call his source and call LOTT back.

161. At 6:11 p.m., **TARGET TELEPHONE 1** made an outgoing intercepted call to FRANKLIN. LOTT told FRANKLIN he needed "one boat" of the "naked ladies" (a type of MDMA pills stamped with a logo that is the silhouette of a nude woman). LOTT said he needed just one boat and if the pills were good, he would get some more later. FRANKLIN asked LOTT if the third party would want the "Batmans" [MDMA pills stamped with the logo of Batman]. FRANKLIN told LOTT the Batmans were red in color. LOTT said the red Batmans would be good. FRANKLIN asked LOTT when he wanted the pills. LOTT stated he wanted them yesterday so he would be coming to meet FRANKLIN in a minute. FRANKLIN stated that he would be obtaining the pills shortly and would be taking a taxi to go get them.

162. At 6:14 p.m. on March 30, **TARGET TELEPHONE 1** received an incoming intercepted call from FRANKLIN. FRANKLIN told LOTT it was all good, which agents took to mean he had obtained the MDMA tablets, and LOTT stated he was on his way to FRANKLIN's location.

163. I noted from a subsequent analysis of FRANKLIN's tolls that during the period of time when he indicated he was attempting to obtain the pills for LOTT, FRANKLIN's telephone had contact with the cellular telephone subscribed to **Major NORTON**, who was using (707) 712-1138.

164. Immediately following this telephone call (at approximately 6:15 p.m. on March 30, 2010), officers observed LOTT exit the NORTH BAY ALTERNATIVE HEALING CENTER, walk to a vehicle, and drive to FRANKLIN's residence at 1119 Beach Street in Vallejo. Agents observed LOTT arrive at FRANKLIN's residence at approximately 6:23 p.m.

165. While enroute to FRANKLIN's residence, at approximately 6:17 p.m., **TARGET TELEPHONE 1** received an incoming intercepted call from Nicholas RAMIREZ. RAMIREZ told LOTT his source had the "blue Playstations" [MDMA pills blue in color and stamped with a logo depicting a symbol Sony's popular Playstation gaming console]. LOTT asked RAMIREZ how long it would take him to get the pills. RAMIREZ said his source was in Oakland and, if RAMIREZ were to leave now, RAMIREZ would meet his source in Richmond. LOTT stated his "dude from the club" [marijuana dispensary owner Clifford BULLOCK] wanted the pills. LOTT added that if FRANKLIN were not able to get the pills, LOTT would have RAMIREZ get them.

166. Surveillance agents subsequently observed LOTT arrive at FRANKLIN's known residence and enter.

167. At 6:32 p.m. on March 30, 2010, **TARGET TELEPHONE 1** received an incoming intercepted call from Nicholas RAMIREZ. RAMIREZ asked LOTT if he still wanted the pills. LOTT said no.

168. At approximately 6:38 p.m., surveillance agents observed FRANKLIN exit his residence and get into a Yellow Cab, which had arrived in front of his home. The cab immediately pulled way.

169. At 6:52 p.m. on March 30, 2010, **TARGET TELEPHONE 1** received an incoming intercepted call from "Victoria." LOTT told Victoria he was, "Waiting for Black, trying to make this move." LOTT said he was referring to "Black" at the "Club." During this investigation, I learned that "Black" from the "Club" referred to Clifford BULLOCK, III, president of the NORTH BAY ALTERNATIVE HEALING Corporation, a marijuana dispensary in Vallejo. At approximately the same time as this call was occurring, officers observed FRANKLIN return to his residence in the same Yellow Cab which stopped in front and FRANKLIN re-entered the home.

170. At 6:56 p.m., LOTT used **TARGET TELEPHONE 1** to make an outgoing intercepted call to BULLOCK at (510) 779-8156. LOTT told BULLOCK that he had "it," [the MDMA pills that BULLOCK had requested during previous calls]. LOTT said he would be at the location in ten minutes.

171. At 7:27 p.m., **TARGET TELEPHONE 1** received an incoming intercepted call from BULLOCK using the NORTH BAY ALTERNATIVE HEALING business line of (707) 980-7221. LOTT addressed BULLOCK as "Black" and said he just got them [the MDMA pills] and he was leaving now. BULLOCK replied that "he" was there, too. Shortly after this call, surveillance agents observed that LOTT's vehicle was no longer at FRANKLIN's residence.

172. At 7:35 p.m., **TARGET TELEPHONE 1** received an incoming intercepted call from an unknown male. LOTT told the unknown male he was going to the cannabis club, as he was "making drops right now."

173. At 7:38 p.m., **TARGET TELEPHONE 1** received an incoming intercepted call from BULLOCK using the NORTH BAY ALTERNATIVE HEALING business line of (707) 980-7221. LOTT addressed BULLOCK as "Black" and said he was right on Napa and Main Streets (in Vallejo). A short time later, officers observed a vehicle similar to the one which LOTT had been observed driving earlier now, driving away from NORTH BAY ALTERNATIVE HEALING. This vehicle was followed, but officers soon lost sight of it.

174. At approximately 8:00 p.m., officers observed FRANKLIN drive away from his residence in his white Expedition. Surveillance followed FRANKLIN to the residence of Bruce THURMON. Based upon intercepted calls, I believe LOTT either traveled to this location or was dropped off at THURMON's residence after meeting with BULLOCK at NORTH BAY ALTERNATIVE HEALING. At approximately 8:50 p.m., officers followed FRANKLIN from THURMON's residence back to FRANKLIN's residence at 1119 Beach Street.

175. At approximately 9:00 p.m. on March 30, 2010, surveillance agents observed a vehicle arrive at FRANKLIN's house and an individual or individuals enter FRANKLIN's home. A short time later, this person or persons were observed leaving the home, returning to the vehicle, and driving away. Officers maintained continuous surveillance of the vehicle as it traveled through Vallejo and subsequently stopped at a 7-11 Convenience Store a short while later. Officers then contacted the two occupants of the vehicle and identified the passenger as Major NORTON. Officers positively identified NORTON and conducted a parole search of his person. At the time of the search, NORTON was on parole for a 2008 felony conviction for possession of MDMA for sale.

176. During a search of NORTON's person, officers located approximately $2,300 in U.S. currency. I know this is the approximate wholesale price for "one boat," that is, 1000 MDMA pills, based upon the quoted prices intercepted and monitored by agents during the LOTT wiretap.

177. Based upon the intercepts, toll analysis and surveillance described above, that the following scenario unfolded during a significant drug deal on March 30, 2010. FRANKLIN obtained 1000 MDMA pills from Major NORTON. FRANKLIN then supplied the 1000 MDMA pills to LOTT. LOTT, in turn, sold the 1000 MDMA pills to Clifford BULLOCK at the marijuana dispensary. After LOTT sold BULLOCK the MDMA pills, LOTT then gave FRANKLIN the money from the sale while at Bruce THURMON's residence. Major NORTON then traveled to FRANKLIN's residence and obtain the proceeds from the MDMA sale, minus LOTT and FRANKLIN's profit.

178. Inquiries with the California Department of Justice (DOJ) revealed that BULLOCK has a criminal history including, including the following:

   a. In 1997, a felony conviction for Grand Theft resulting in 3 years probation and 120 days jail;

   b. In 2002, two separate felony convictions in Napa County, both for Transportation/Sales of a Controlled Substance, the first of which he was sentenced to 16 months prison and the second for which he was sentenced to 3 years prison;

   c. In 2003, a felony conviction for Grand Theft in Sacramento County for which he was sentenced to 2 years prison;

   d. In 2006, an arrest for Cultivation of Marijuana, resulting in a Parole Violation; and

   e. In 2007, an arrest in San Joaquin County for Possession of Marijuana for Sale, resulting in a Parole Violation.

**April 5-17, 2010 – LOTT Supplies Latroy CUNNINGHAM with MDMA Pills and Marijuana – LOTT Obtained the MDMA and Marijuana from Nicholas RAMIREZ, Marcus DAVIS, and Clifford BULLOCK – CUNNINGHAM Successfully Ships the Drugs Back to Wisconsin**

179. On April 5, 2010, at 8:32 a.m., LOTT called an individual subsequently identified as Latroy CUNNINGHAM. During the intercepted call, CUNNINGHAM told LOTT that he was currently in Milwaukee, Wisconsin. LOTT asked CUNNINGHAM if he needed any "skittles," [slang for MDMA pills] out there. CUNNINGHAM said they were hard to get and they needed all of them. LOTT told CUNNINHAM to send him some money and he would get them to him. LOTT added, "I got avenues, I got a few connections." CUNNINGHAM then told LOTT that he needed a deal on a plane ticket to come out there. LOTT said he could get him one that day.

180. Inquiries with NCIC revealed that CUNNINGHAM had an extensive criminal history in Wisconsin with multiple arrests for Possession of Cocaine, Possession with Intent to Deliver Cocaine, Battery, Failure to Appear, False Imprisonment, and Possession of Cocaine with Intent (apparent felony conviction 2003). NCIC records further reflected that CUNNINGHAM was also arrested in Illinois in 1996 and received a felony for Possession of a Controlled Substance. Inquiries with the California DMV revealed that CUNNINGHAM obtained a California driver's license in 2007 and during 2008 provided a resident address of 135 Carolina, #G10, Vallejo, California.

181. ON April 5, 2010, at 9:23 a.m., LOTT called FRANKLIN and related that he needed a plane ticket for his friend from Milwaukee. FRANKLIN told LOTT to have CUNNINGHAM text message LOTT the name he wanted on the ticket and when he wanted to leave.

182. At 9:59 a.m., LOTT called CUNNINGHAM and told him to text the name and date he wanted to leave to LOTT for a round trip ticket. CUNNINGHAM told LOTT he didn't know when he would return because he had to "get shit straight right away."

183. At 10:11 a.m., LOTT received a call from FRANKLIN who said he didn't put where they were flying into on the ticket, only the name. LOTT told FRANKLIN that they were flying from Milwaukee.

184. At 10:12 a.m., LOTT received an incoming call from CUNNINGHAM who confirmed that he would be coming from Milwaukee and that the name would be "LaTroy, like L.A.Troy."

185. At 10:13 a.m., LOTT received an incoming call from FRANLKIN again asking where they were flying from. LOTT said that they were flying from Milwaukee into Oakland or San Francisco. LOTT told FRANKLIN that it was so they could make some money. LOTT added that when CUNNINGHAM arrived in California, he (CUNNINGHAM) was going to do business with them (LOTT and FRANKLIN) and it would be good.

186. At 11:31 a.m., LOTT contacted RAMIREZ at **TARGET TELEPHONE 2**. LOTT told RAMIREZ that he wanted to hook up with him. RAMIREZ indicated he was out of town and would call LOTT when he got back. I believe that LOTT wanted to talk to RAMIREZ about getting MDMA for CUNNINGHAM when CUNNINGHAM arrived from Wisconsin.

187. At 2:57 p.m., LOTT called FRANKLIN. FRANKLIN said the plane tickets would cost $300.

188. On April 6, 2010, at 10:21 a.m., LOTT called FRANKLIN and asked if his brother obtained the tickets. FRANKLIN stated that once they gave his brother the money he would give them the confirmation number. LOTT and FRANKLIN then discussed how much money they would make each.

189. At 10:47 a.m. on April 6, 2010, LOTT called CUNNINGHAM in Milwaukee. CUNNINGHAM told LOTT that he only needed one ticket because he planned on coming by himself. CUNNINGHAM told LOTT that he would wire him the money.

190. On April 7, 2010, at approximately 8:00 p.m., LOTT received an incoming call from CUNNINGHAM. CUNNINGHAM said his flight was about to take off and he would call LOTT when he arrived.

191. On April 8, 2010, LOTT was intercepted speaking with CUNNINGHAM. CUNNINGHAM said he had arrived and was staying at the Civic Center Best Western Hotel in San Francisco. LOTT indicated that he would come and pick CUNNINGHAM up.

192. Agents subsequently contacted the manager at the Civic Center Best Western Hotel on April 8, 2010, and obtained a copy of a room registration in the name of Latroy CUNNINGHAM of 135 Caroline, Vallejo, California. According to the record, CUNNINGHAM checked into Room 64 at the hotel during the late evening/early morning of April 7, 2010.

193. Shortly after calling CUNNINGHAM, LOTT placed an intercepted call to RAMIREZ over **TARGET TELEPHONE 2.** During the intercepted call, LOTT said he had "some folks here from out of town out here" and he needed to meet with RAMIREZ.

194. A short while later, LOTT was intercepted calling CUNNINGHAM and stating he was there to pick him up. CUNNINGHAM directed him to the room and told him he was going to check out, go with LOTT, and check back in later. At about the time of this intercepted call, surveillance agents observed LOTT at the Civic Center Best Western Hotel in San Francisco.

195. During the remainder of the day on April 8, 2010, LOTT was intercepted multiple times speaking with FRANKLIN and RAMIREZ regarding obtaining MDMA for a customer. LOTT was also intercepted calling Lawrence Kenney NELSON about obtaining cocaine and cocaine base. I believe LOTT was attempting to obtain multiple types of drugs for CUNNINGHAM and CUNNINGHAM, in turn, planned to send the drugs back to Wisconsin to sell them at a significant markup in price.

196. On April 12, 2010, at approximately 10:05 a.m., LOTT was intercepted speaking with CUNNINGHAM. LOTT asked CUNNINGHAM if he was still in Sacramento or if he had come back to Vallejo. CUNNINGHAM said he was in Vallejo and had spent "twelve-five" [$12,500] since he had been out there and was ready to cut out. LOTT and CUNNINGHAM discussed getting together later to talk.

197. Approximately two hours later, LOTT placed an intercepted call to Marcus DAVIS, RAMIREZ's MDMA trafficking partner. During the intercepted call, LOTT asked DAVIS for "a half a boat," that is, 500 MDMA tablets. DAVIS affirmed that he had them and that they were the red Batman pills. During a series of intercepted calls between 12:40 p.m. and 3:18 p.m. on April 12, 2010, LOTT and DAVIS agreed to meet for LOTT to obtain the pills. At approximately 3:57 p.m., LOTT received an incoming call from CUNNINGHAM. LOTT said he had been waiting to hear from him. LOTT was also intercepted contacting an unidentified individual and informing this person that he was looking to obtain some Promethyzene Syrup with Codeine ("Purple Drank") for his friend who was in town.

198. On April 13, 2010, at approximately 9:00 a.m., LOTT was intercepted contacting CUNNINGHAM. CUNNINGHAM said he was at the Motel 6 in Vallejo. LOTT indicated he was going to come by his room shortly. LOTT then was intercepted shortly thereafter contacting an unknown male and telling this person that "my folks want to hook up this morning."

199. At approximately 12:50 p.m., LOTT was intercepted calling RAMIREZ over **TARGET TELEPHONE 2**. During the intercepted call, LOTT told RAMIREZ he needed at least "half a boat," [500 MDMA tablets]. RAMIREZ said he would be in Vallejo shortly and would call LOTT.

200. At approximately 12:53 p.m., immediately following the call with RAMIREZ, LOTT was intercepted contacting CUNNINGHAM. LOTT told CUNNINGHAM that as soon as his "partner" got there, LOTT would call CUNNINGHAM.

201. At approximately 1:14 p.m. on April 13, 2010, LOTT was intercepted contacting DAVIS and advising him that LOTT had called RAMIREZ and was still waiting on him. DAVIS said he could bring LOTT a half a boat and that he had it at his house. A short time later, LOTT received a intercepted call from RAMIREZ. RAMIREZ said he was at DAVIS's residence and LOTT should come over.

202. Immediately following this call, LOTT contacted BULLOCK at NORTH BAY ALTERNATIVE HEALING and asked for two pounds of reasonably-priced marijuana.

203. On April 14, 2010, LOTT was intercepted speaking with CUNNINGHAM in the morning and indicating he would pick him up and they would be "rolling." During this day, LOTT repeatedly contacted BULLOCK about obtaining marijuana and FRANKLIN about obtaining MDMA.

204. On April 15, 2010, at approximately 10:15 a.m., LOTT was intercepted calling CUNNINGHAM. During this call, LOTT referenced the fact that "Black" (BULLOCK) had given him the wrong bag and it had been "3 zips short," [three ounces short], but that they had made it right. CUNNINGHAM said he needed to "get it lined up and put in a box" because he wanted to be leaving around 4 p.m. I believe CUNNINGHAM is referring to putting the drugs LOTT has gathered for him into a commercial transportation shipping box in order to send it back to Wisconsin.

205. On April 17, 2010, at approximately 3:59 p.m., LOTT received an incoming intercepted call from CUNNINGHAM. During the intercepted call, CUNNINGHAM said he wanted to let LOTT know he had landed and that he was back in Milwaukee and wouldn't be in Chicago until the following day. LOTT asked CUNNINGHAM about "the DVD's and the T-shirts." CUNNINGHAM told LOTT they were all right. CUNNINGHAM affirmed to LOTT a second time that it was all good. LOTT told CUNNINGHAM to call as soon as they reached home base. CUNNINGHAM agreed. I believe this call contained coded language between LOTT and CUNNINGHAM. They were discussing whether the drugs [DVD's and T-shirts] shipped by commercial means had arrived in Wisconsin safely. CUNNINGHAM tells LOTT that the drugs did arrive in Wisconsin safely.

**April 9, 2010 - Marcus DAVIS Supplies MDMA Pills to LOTT During Drug Deal with UC**

206. During the first week of April 2010, I placed recorded calls to LOTT. During these recorded calls, I told LOTT that I anticipated meeting with him on April 9, 2010 to obtain up to 3,000 additional MDMA tablets.

207. On April 8, 2010, LOTT was intercepted using **TARGET TELEPHONE 1** to communicate with RAMIREZ over **TARGET TELEPHONE 2**. During the intercepted call, RAMIREZ said he was calling LOTT to find out if LOTT wanted him to arrange "three of them for sure" (3,000 MDMA) for the following day. LOTT confirmed with RAMIREZ that LOTT did want the pills. RAMIREZ said he could line it up so that the pills were available from "Killa," aka Marcus DAVIS, in the morning of April 9, 2010.

208. On April 9, 2010, I placed a recorded call to LOTT and said that I initially only wanted 2,000 MDMA pills. A short time later, LOTT used **TARGET TELEPHONE 1** to make an intercepted call to Marcus DAVIS at (707) 514-9114. During the intercepted call, LOTT made arrangements to meet with DAVIS to obtain MDMA pills. Surveillance agents subsequently observed LOTT driving to a Vallejo Chevron gas station to meet me to conduct the drug deal. Surveillance agents observed that LOTT was accompanied by a black male adult, believed to be Marcus DAVIS, sitting in the passenger seat. During the recorded and surveilled drug deal, LOTT provided me with 2,000 MDMA pills in exchange for $5,700. Surveillance agents then followed LOTT from our drug deal directly back to DAVIS's residence at 601 Mark Street in Vallejo. At the residence, agents observed the passenger (suspected of being DAVIS) exiting LOTT's vehicle and entering the residence.

209. The DEA Western Regional Laboratory subsequently identified the substance purchased as being approximately 421 grams of a substance and mixture containing MDMA and Methamphetamine.

210. After the first drug deal on April 9, 2010, I placed a recorded called to LOTT to discuss obtaining an additional 1,000 MDMA pills. After our discussion, LOTT was intercepted over **TARGET TELEPHONE 1** contacting Marcus DAVIS at (707) 514-9114 to obtain the pills that I had just ordered. While these calls were occurring, LOTT was observed by agents meeting with FRANKLIN and THURMON at THURMON's residence. After I requested the additional pills from LOTT, and after he was intercepted calling DAVIS to arrange to obtain to obtain the additional pills, LOTT and FRANKLIN were observed leaving

THURMON's residence. Agents lost sight of LOTT. THURMON placed an intercepted call to LOTT. During the intercepted call, THURMON warned LOTT that THURMON had observed undercover law enforcement officers following FRANKLIN away from THURMON's residence. LOTT told THURMON that he did not believe it.

211. A short time later, surveillance agents observed DAVIS driving LOTT to the Vallejo Chevron station in a vehicle registered to DAVIS. As I waited, I observed LOTT and DAVIS exit the vehicle. I met with LOTT and he sold me 1,000 MDMA pills for $2,850. After this drug deal, agents surveilled LOTT and DAVIS to DAVIS's residence.

212. The DEA Western Regional Laboratory subsequently identified the substance purchased as being 225.9 grams of a substance and mixture containing Methamphetamine.

### April 16, 2010 – UC Buys 2000 MDMA Pills Supplied by FRANKLIN – Intercepted Call Between LOTT and Damian PETERSON about Cocaine

213. In the days leading up to April 16, 2010, I engaged in numerous recorded telephone calls with LOTT. During the recorded calls, I indicated that I would attempt to meet LOTT on April 16, 2010, to purchase an additional 2000 MDMA pills. Following my calls, LOTT was intercepted contacting RAMIREZ, DAVIS, and FRANKLIN to ascertain what types of MDMA pills were available. During our calls, I asked LOTT for the specific types of MDMA pills that I believed (based on intercepted calls) that FRANKLIN had. This plan worked. LOTT was intercepted arranging with FRANKLIN to have the MDMA pills ready to deliver to me on April 16, 2010.

214. On April 16, 2010, at approximately 2:00 p.m., I arranged to meet with LOTT at the Valero Gas Station on Tennessee Street in Vallejo to conduct the drug deal. LOTT was intercepted over **TARGET TELEPHONE 1** contacting FRANKLIN saying that his customer was en route to meet LOTT at the Valero Gas Station to obtain the MDMA pills. FRANKLIN called LOTT at approximately 2:07 p.m. and confirmed that it was only for 2000 pills. LOTT confirmed the deal would be for 2000 pills.

215. I met with LOTT at the Valero Gas Station and LOTT sat in my vehicle and, over the course of 45 minutes, LOTT engaged in numerous intercepted calls with FRANKLIN. During these call, FRANKLIN said he was meeting with the source for the MDMA pills. At approximately 3:02 p.m., I observed FRANKLIN arrive at the Valero Gas Station in his vehicle. LOTT indicated that FRANKLIN was his friend and the source for the pills. I observed LOTT walk over to FRANKLIN's vehicle, obtain the pills, and walk back to my vehicle. Inside my vehicle, LOTT sold the the approximately 2000 MDMA pills he had just obtained from FRANKLIN. I gave $5700 to LOTT for the MDMA pills.

216. The DEA Western Regional Laboratory subsequently identified the substance purchased as being 596.5 grams of a substance and mixture containing 3-4 Methylenedioxymethamphetamine Hydrochloride (MDMA).

217. Immediately following this transaction, LOTT was intercepted over **TARGET TELEPHONE 1** contacting Damian PETERSON at 3:37 p.m. During the intercepted call, LOTT asked PETERSON if he had "did that shit," which PETERSON affirmed. LOTT said

he thought he wanted "a quarter and a heimer of that shit." PETERSON stated that it was good but that he had a haircut appointment at 5 p.m. and wasn't coming out till afterwards. LOTT told PETERSON he would wait for him.

### July 30, 2010 – UC Purchases Approximately 5000 Methamphetamine Tablets from LOTT – These 5000 Pills are Believed to be Supplied by Major NORTON

218.  During July of 2010, I engaged in numerous recorded telephone calls with LOTT. During the recorded calls, I discussed possibly obtaining 5000 MDMA tablets from him on July 30, 2010.

219.  At this time, there was a court authorized pen register on LOTT's Telephone, **TARGET TELEPHONE 1**. I examined the pen register information for **TARGET TELEPHONE 1** during the days leading up to the drug deal (and after I had placed my order for 5000 MDMA pills). I noted that LOTT's telephone was in regular contact with the identified cellular telephone subscribed in the name of Major NORTON. I also noted that it appeared that whenever I contacted LOTT in order to discuss this 5000-pill purchase, the pen register on **TARGET TELEPHONE 1** recorded subsequent contacts with NORTON's telephone.

220.  On July 30, 2010, at approximately 8:52 a.m., I placed a call to LOTT. LOTT said that he would be expecting me around 11:00 a.m. I asked if they could meet me at 11:30 a.m. LOTT agreed.

221.  According to the pen register, immediately following this call (less than one minute later), LOTT placed a call to NORTON's telephone. At approximately 9:10 a.m., NORTON's telephone contacted **TARGET TELEPHONE 1** again, and at 9:50 a.m., LOTT contacted NORTON's telephone.

222.  At approximately 11:01 a.m., I placed a call to LOTT over **TARGET TELEPHONE 1**. I told LOTT that I was running a little late. LOTT said he was waiting on me at his house. LOTT told me had the pills and that most of the pills were Triple Stack Superman pills.

223.  At approximately 11:45 a.m., I placed a call to LOTT at **TARGET TELEPHONE 1** and told LOTT that I was in Fairfield with the female buyer and would leave her and come meet LOTT. LOTT ultimately agreed to come to the Jack-in-the-Box on Red Top Road. LOTT said he would be there in ten minutes.

224.  Pen Register information on **TARGET TELEPHONE 1** revealed that between my call to LOTT at 11:01 a.m. and my subsequent call at 11:45 a.m., LOTT exchanged four (4) calls with NORTON's telephone.

225.  At approximately 12:00 p.m., I met with LOTT at the Circle K/Union 76 gas station at Red Top Road and Highway 80. During the drug deal, LOTT displayed the 5000 pills. Initially, I purchased approximately 4500 pills of various types for $12,160. I told LOTT that I would take these pills to the female buyer and see if she wanted me to purchase the remaining 500 pills because they were a grab-bag of various colors and emblems. I explained to LOTT that I needed to find out if she would accept them. Approximately an hour later (1:00 p.m.) I met

with LOTT at the nearby Burger King restaurant at the Cordellia and Highway 80 exit.
There, I purchased the remaining approximately 500 tablets for $1,340.

226. The DEA Western Regional Laboratory analyzed the substance I purchased from LOTT as
being approximately 1636.4 grams of a substance and mixture containing Methamphetamine.
This amount did not include some pills which were not analyzed.

227. Based upon the call pattern between LOTT's telephone and NORTON's telephone, as well as
the subsequent call pattern on later dates and the observation of NORTON accepting MDMA
proceeds from LOTT immediately following an MDMA transaction on August 27, 2010,
(described below), I believe that NORTON supplied LOTT with the 5000 pills containing
methamphetamine pills that I purchased from LOTT on July 30, 2010.

### August 27, 2010 - Purchase of Approximately 6000 MDMA Tablets from LOTT – These
### 6000 Pills were Supplied by Major NORTON

228. During August of 2010, I engaged in numerous recorded telephone calls with Michael
LOTT. During the recorded calls, I discussed possibly obtaining 5000 MDMA tablets from
him on August 27, 2010.

229. At the time of these recorded calls, there was a court-authorized pen register on LOTT's
Telephone, **TARGET TELEPHONE 1**. I examined the pen register information for
**TARGET TELEPHONE 1** on the days leading up to the drug deal (and after I had placed
my order for 5000 MDMA pills). I again noted that LOTT's telephone was in regular
contact with the identified cellular telephone subscribed in the name of Major NORTON. I
also noted that it appeared that whenever I contacted LOTT in order to discuss this purchase,
**TARGET TELEPHONE 1** the pen register revealed LOTT's phone having subsequent
contact with NORTON's telephone.

230. For example, on August 24, 2010, at approximately 11:05 a.m., the pen register showed
LOTT placed a telephone call to NORTON's telephone. Immediately after this call, LOTT
placed a call to my number but that I missed the call. At approximately 11:12 a.m., I
placed a call to LOTT. LOTT told me that his MDMA source had just called him and
wanted to know if there was a particular kind of MDMA that my female buyer would
definitely not want or if she cared if they were all one kind, etc. I told LOTT she hadn't
expressed a preference but that I spoke to her last night and she said she would definitely get
between a minimum of 5000 tablets, possibly up to 7000 pills. The pen register on LOTT's
telephone showed that, within seconds of the termination of our call, LOTT immediately
called NORTON's telephone.

231. On August 26, 2010, I spoke with LOTT. He told me that he had already obtained the pills
and was ready for me the following day. Before and after this call, I noted the pen register
showed numerous calls from LOTT to NORTON's telephone.

232. On August 27, 2010, at approximately 8:06 a.m., I placed a call to LOTT after missing a call
from his number. LOTT told me he was just checking on the status of my arrival because he
wanted to tell the source how soon he would be meeting him to give him the money he owed
him before LOTT left town with his wife. I told LOTT that I would be picking up the female

buyer momentarily and anticipated being in LOTT's area around 10:00 a.m. At approximately 8:27 p.m., LOTT placed a call to NORTON's telephone.

233. At approximately 9:16 a.m. and 9:38 a.m., LOTT's telephone received incoming calls from NORTON's telephone. Within a minute of the last incoming call from NORTON, LOTT attempted to contact my telephone, which I did not answer. At approximately 9:41 a.m., I called LOTT. LOTT told me that the source of supply had just called LOTT again and asked how far away I was from meeting LOTT. I told LOTT that I was in Davis and would be there in 30 to 45 minutes. LOTT told me to hurry and to meet him at the Jack-in-the-Box on Red Top Road in Fairfield, where we had met before.

234. At approximately 10:10 a.m., I placed a call to LOTT and told LOTT that I had just dropped off the female buyer in Fairfield and would be at the Jack-in-the-Box in 15 minutes. LOTT said he would be there. Within seconds of the termination of this call, LOTT placed a call to NORTON's telephone.

235. At approximately 10:30 a.m., I met with LOTT at the Circle K/Union 76 gas station at Red Top Road and Highway 80. LOTT displayed 7000 MDMA pills, contained in a flower-patterned purse/handbag, which he claimed to have obtained from the buyer. LOTT asked me to purchase 6000 pills instead of the 5000-5500 we had discussed because he did not want to take 2000 pills back to the source. I agreed to purchase 6000 of these tablets for $15,000 that I had with me. LOTT put the money I gave him back in the flowered hand bag with the remaining amount of pills. LOTT told me that he would take the money and the remaining pills back to the source before he and his wife left town on vacation that day.

236. The DEA Western Regional Laboratory analyzed the substance I purchased from LOTT as being approximately 1941.7 grams of a substance and mixture containing 3-4 Methylenedioxymethamphetamine Hydrochloride (MDMA); this weight does not include a portion of pills which were not analyzed.

237. Immediately following this purchase from LOTT on August 27, 2010, TFO Vang observed LOTT walk back to his black Mercedes (which was registered to him). LOTT pulled away from the gas station, with an unidentified, male black adult in its right, front passenger seat. The Mercedes traveled westbound Interstate 80 from Red Top Road.

238. At approximately 10:45 a.m., TFO Vang observed the Mercedes pull up to the closed, vehicle gate for the Sereno Village Apartments at 750 Sereno Drive, Vallejo, California. At the gate, TFO Vang observed the right, front passenger exit from LOTT's vehicle. The passenger (20's, approximately 5'09", 190 lbs) was wearing a black baseball cap, a white hooded sweatshirt, and dark jeans. Det. Rodriguez observed that the passenger exited LOTT's vehicle carrying the same flower-patterned purse/handbag that LOTT had delivered the pills to me within and which I had observed him place the money and the remaining pills which he had stated he was going to return to the MDMA source of supply. The passenger entered the complex through the pedestrian gate and stood in the parking lot, talking to several subjects passing by as if he was waiting for someone. LOTT was observed at this same time driving his Mercedes down the street to the Raley's Supermarket strip mall complex where he parked.

239. At approximately 10:53 a.m., Detectives Rodriguez and Badour observed a silver Pontiac Grand Prix drive up to gate at Sereno Village Apartments. The Pontiac entered the complex as the gate opened up. Detectives Rodriguez and Badour observed LOTT's passenger get into the right, front seat of the Pontiac in the parking lot of the complex; the passenger was still carrying the flower-patterned purse/handbag when he entered the vehicle. The Pontiac continued into the eastern part of the lot.

240. At approximately 10:55 a.m., Det. Badour walked by the Pontiac which was parked on the east side of the apartment complex. Det. Badour stated the passenger door to the Pontiac was opened. Det. Badour observed the driver and LOTT's passenger counting money inside the Pontiac. Det. Badour positively identified the Pontiac's driver as Major NORTON.

241. At approximately 11:01 a.m., LOTT's passenger exited from the Pontiac and stayed inside the complex. The Pontiac exited from the complex. Agents subsequently located the silver Pontiac parked at another location and they observed NORTON get out of the Pontiac, wearing a black do-rag, a tee-shirt, and sweat pants.

### Clifford BULLOCK Identified as Operating Large Outdoor Marijuana Grow in Yuba County Seized in September 2010

242. On August 6, 2010, agents and officers conducted surveillance of Clifford BULLOCK and the site of his marijuana dispensary (NORTH BAY ALTERNATIVE HEALING) at 1516 Napa Street, Vallejo, California. A few days prior to this, I received information from a Confidential Source ("CS-3"), that BULLOCK had just told CS-3 that BULLOCK was to be receiving a large consignment of marijuana clone plants and/or marijuana on August 6, 2010. CS-3 said he/she had received this information while speaking with BULLOCK over his cellular telephone (510) 779-8156. This is the same number BULLOCK was intercepted talking to LOTT on March 31, 2010, while BULLOCK arranged to obtain MDMA pills from LOTT. When CS-3 revealed this information about BULLOCK to me, I had not provided any details to CS-3 about the LOTT wiretap or intercepted calls with BULLOCK during the wiretap.

243. During the course of the surveillance of NORTH BAY ALTERNATIVE HEALING on August 6, 2010, agents observed BULLOCK meet with an individual identified as Gregory Scott MCCLELLAN at the rear of the dispensary. Subsequent indices checks revealed that MCCLELLAN owned several hundred acres in rural Yuba County and satellite surveillance photographs of this property revealed several apparently active marijuana grow sites.

244. On September 16, 2010, agents executed a federal search warrant at two side-by-side 230 acre properties owned by Gregory McCLELLAN. At various garden sites throughout this property, in and around the different structures, agents and officers recovered approximately 400 marijuana plants ranging from six feet to twelve feet tall and six firearms. Agents also recovered approximately $20,000 in U.S. currency. Additional amounts of marijuana plants were located which were hanging and drying on the National Forest Service land bordering McCLELLAN's property to the north. McCLELLAN admitted that over the years he had rented portions of both parcels to various individual who he was aware had specifically utilized the locations as sites at which to grow marijuana.

245. MCCLELLAN advised that most of the marijuana plants located in the north garden which he claimed as his own had been supplied by "Clifford," whom he subsequently identified from a California DMV driver's license photograph as Clifford BULLOCK. MCCLELLAN identified BULLOCK as the owner and operator of the NORTH BAY ALTERNATIVE HEALING marijuana dispensary in Vallejo. MCCLELLAN said he had been supplying BULLOCK with multiple-pound quantities of marijuana for two years and he had originally been selling the marijuana for between $2200 and $2500 per pound. Recently, however, he had only been receiving $1800 per pound from BULLOCK because of a marijuana "glut."

246. McCLELLAN said BULLOCK had given him many of the starter plants located in this garden, as well as numerous medical recommendations in the names of people whom McCLELLAN had never met. McCLELLAN said BULLOCK was going to be expecting a large amount of marijuana from the harvest in early October. Agents also located a $6,000 check made out to McCLELLAN from a NORTH BAY ALTERNATIVE HEALING account. McCLELLAN had not yet cashed that check.

### December 16, 2010 – UC Purchases 400 Oxycodone Pills from LOTT - Eileen KNIGHT Supplied the Oxycodone Pills to LOTT

247. Between September 6, 2010, and December 16, 2010, I engaged in recorded drug-related telephone calls with LOTT. During some of these conversations, LOTT indicated his Oxycodone source of supply was a female from Los Angeles, identified as Eileen KNIGHT. Toll analysis of LOTT's telephone showed repeated contact with the telephone subscribed to KNIGHT and over which she had previously been intercepted in March of 2010 having Oxycodone-related telephone calls with LOTT. I believe the pattern of calls between me, LOTT, and KNIGHT showed that LOTT was contacting KNIGHT to obtain the Oxycodone that I was ordering from LOTT.

248. For example, on November 5, 2010, at approximately 8:31 p.m., I contacted LOTT after missing a call from this number moments before. LOTT said he had just spoken to his "sister," who had just called him from Los Angeles. LOTT said his "sister" said she had OP Oxycontin tablets, 80 milligram pills, and that she had 300 of them. I asked LOTT what the price would be for those type of pills. LOTT said he would call her and call me right back. At approximately 8:36 p.m., I received an incoming call from LOTT. LOTT stated that they were $25.00 each to me, that he would make $3.00 per pill, and that the female source would come whenever I wanted the pills. I told LOTT that it would take me at least a week to put the deal together. I told LOTT I would call him after I had a chance to talk to the potential buyer of the Oxycontin. Subsequent toll analysis of LOTT's telephone on this date showed that his cellphone was in contact with KNIGHT telephone immediately before calling me and immediately after stating to me that he was going to call the female source in Los Angeles to obtain the price for the Oxycontin pills. During numerous subsequent calls during late November and early December 2010, LOTT related that his "sister" would come up from Los Angeles whenever I was ready.

249. I subsequently arranged to meet with LOTT on December 16, 2010 in order to purchase 400 Oxycontin tablets. Prior to meeting, LOTT informed me over the telephone that his "sister"

had flown up from Los Angeles and was there with the pills and ready to come with him to meet me. I arranged to meet with LOTT at the Chevron Gas Station on Watt Avenue and Highway 80 in Sacramento. LOTT arrived driving his own vehicle and followed by a rental car. LOTT was observed meeting with a female, identified as Eileen KNIGHT, at the rental vehicle. DEA Special Agent Alicia Ramirez identified KNIGHT based upon her comparison of the observed individual with LOTT at the rental vehicle and Eileen KNIGHT's known DMV driver's license photograph. After meeting briefly with KNIGHT, LOTT walked over to my vehicle and gave me the Oxy tablets in exchange for $8,800.

250. I noted that these pills were green and displayed the "80" and "OC" stamps on each side. This color and type of Oxy pill was consistent with the color and type of Oxy pills LOTT, KNIGHT, Dante BARBARIN and Beshiba COOK discussed during intercepted calls over **TARGET TELEPHONE 1** during March of 2010.

251. The DEA Western Regional Laboratory subsequently analyzed these pills as being 48.1 grams of Oxycodone Hydrochloride. However, the number of pills was only approximately 200, as opposed to the agreed-upon amount of 400.

## Conclusion

252. I request that based upon this Affidavit, a Criminal Complaint and arrest warrants be issued for these individuals for the following crimes:

Count One: **Michael LOTT, Major NORTON, Gaylord FRANKLIN, Clifford BULLOCK, Narco McFARLAND, Sr., and Latroy CUNNINGHAM** - participating in a criminal conspiracy to distribute and possess with intent to distribute MDMA and marijuana, Schedule I Controlled Substances, between approximately July 1, 2008, and the present, all in violation of 21 U.S.C. §§ 846 and 841(a)(1).

Counts Two, Three, Four, and Five: **Michael LOTT** – distribution of a mixture and substance containing a detectable amount of MDMA, a Schedule I Controlled Substance, on or about August 6, 2008, September 10, 2008, March 25, 2010, and April 9, 2010, in violation of 21 U.S.C. § 841(a)(1).

Count Six: **Michael LOTT and Gaylord FRANKLIN** – distribution of a mixture and substance containing a detectable amount of MDMA, a Schedule I Controlled Substance, on or about April 16, 2010, in violation of 21 U.S.C. § 841(a)(1).

Counts Seven and Eight: **Michael LOTT and Major NORTON** – distribution of a mixture and substance containing a detectable amount of MDMA, a Schedule I Controlled Substance, on or about July 30, 2010, and August 27, 2010, in violation of 21 U.S.C. § 841(a)(1).

Count Nine: **Michael LOTT and Lawrence Kennedy NELSON** - participating in a criminal conspiracy to distribute and possess with intent to distribute at least 280 grams of a mixture and substance containing a detectable amount of a form of cocaine base known as "crack cocaine," a Schedule II Controlled Substance, between approximately October 30, 2008, and the present, all in violation of 21 U.S.C. §§ 846 and 841(a)(1).

Counts Ten, Eleven, Twelve, Thirteen, and Fourteen: **Michael LOTT and Lawrence Kennedy NELSON** – distribution of at least 28 grams of a mixture and substance containing a form of cocaine base known as "crack cocaine," a Schedule II Controlled Substance, on or about October 22, 2008, January 28, 2009, May 28, 2008, December 8, 2009, and March 25, 2010, all in violation of 21 U.S.C. § 841(a)(1).

Count Fifteen: **Michael LOTT and Eric ROBINSON** - participating in a criminal conspiracy to distribute and possess with intent to distribute at least 100 grams of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, between approximately May 28, 2009, and the present, all in violation of 21 U.S.C. §§ 846 and 841(a)(1).

Counts Sixteen and Seventeen: **Michael LOTT and Eric ROBINSON** – distribution of a mixture and substance containing heroin, a Schedule II Controlled Substance, on or about May 28, 2009, and August 11, 2009, all in violation of 21 U.S.C. § 841(a)(1).

<u>Count Eighteen</u>: **Michael LOTT, Eileen KNIGHT, Beshiba COOK, and Dante BARBARIN** - participating in a criminal conspiracy to distribute and possess with intent to distribute Oxycondone, a Schedule II Controlled Substance, between approximately March 21, 2010, and the present, all in violation of 21 U.S.C. §§ 846 and 841(a)(1).

<u>Count Nineteen</u>: **Beshiba COOK** – using a communication facility to facilitate a drug trafficking crime, specifically, using the telephone assigned number (510) 776-5076 to facilitate the crime of conspiracy to distribute and possess with intent to distribute Oxycondone, during an intercepted call with Michael LOTT, on or about March 23, 2010, all in violation of 21 U.S.C. § 843(b).

<u>Count Twenty</u>: **Michael LOTT and Eileen KNIGHT** - possession with intent to distribute Oxycondone, a Schedule II Controlled Substance, on or about December 16, 2010, in violation of 21 U.S.C. § 841(a)(1).

<u>Counts Twenty-One and Twenty-Two</u>: **Damian PETERSON** – using a communication facility to facilitate a drug trafficking crime, specifically, using the telephone assigned number (707) 704-2398 to facilitate the crime of conspiracy to distribute and possess with intent to distribute cocaine, during intercepted calls with Michael LOTT, on or about March 22, 2010, and April 16, 2010, all in violation of 21 U.S.C. § 843(b).

<u>Counts Twenty-Three, Twenty-Four, and Twenty-Five</u>: **Mikel BROWN** – using a communication facility to facilitate a drug trafficking crime, specifically, using the telephone assigned number (707) 333-3209 to facilitate the crime of conspiracy to distribute and possess with intent to distribute cocaine and a form of cocaine base known as "crack cocaine," during intercepted calls with Michael LOTT, on or about March 27, 2010, March 29, 2010, and April 3, 2010, all in violation of 21 U.S.C. § 843(b).

Count Twenty-Six: **Bruce THURMON** – using a communication facility to facilitate a drug trafficking crime, specifically, using the telephone assigned number (707) 731-2743 to facilitate the crime of conspiracy to distribute and possess with intent to distribute cocaine, during an intercepted call with Michael LOTT, on or about March 22, 2010, all in violation of 21 U.S.C. § 843(b).

I swear under penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information and belief.

Brian Nehring, Special Agent
Drug Enforcement Administration

Sworn to and subscribed before
me on the ____ day of April, 2012

**GREGORY G. HOLLOWS**
Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE

Approved as to form:

Jason Hitt
Assistant U.S. Attorney